## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

**TOP NOTCH CONSULTING, INC.**    *

                            *

     **Plaintiff,**             *

                            *

**v**                              *    **CASE NO. :   2:05 CV 996-WKW**

                            *

**UNIVERSAL CITY, LLC.; and**    *

**FREDERICK J. BEASLEY, III,**    *

                            *

     **Defendants.**           *

RECEIVED

2006 NOV -7  A 9: 35

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

## BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The Complaint filed in this case lists four causes of action. These are Breach of Contract, Interference With Business Relations, Violation of Alabama's Trade Secrets Act and Quantum Meruit. Each of these causes of action will be discussed in this Brief in the order in which they are alleged.

The Complaint in this case was filed in October, 2005. Before that time and since the filing of this Complaint, Plaintiff and its counsel have not contacted any witnesses identified in its response to discovery. On the contrary, the only contact these witnesses have had with anyone connected with this case has been with the undersigned. As will be shown below, this case involves a contract. There was no breach of this contract by Defendants and the remainder of the case has no basis in fact.

The Answers and Supplemental Answers to Defendant's Interrogatories attached as an exhibit to this Motion for Summary Judgment are somewhat confusing. They are in the

form of a first person narrative even though Plaintiff is purportedly a corporation.

## STATEMENT OF UNDISPUTED FACTS

### COUNT I. BREACH OF CONTRACT

The contract in this case was not filed with the Complaint. Rather, it was filed by the undersigned at the direction of the presiding Magistrate Judge on May 19, 2006 and was assigned Document No. 29.

This contract, also known as a "Management Agreement," was signed on April 28, 2005 by Fred Beasley, Manager of Universal City, LLC and William Brew, President of Top Notch Consulting, Inc. Those portions of the contract which appear to be pertinent in this litigation are as follows:

> 3. Agreement to Engage: In consideration of this Agreement, Universal agrees that they shall treat all materials prepared by Top Notch as confidential and shall not disclose, copy, or share such materials without written consent of Top Notch.
> 4.  Compensation: In consideration for the services enumerated above, Universal shall pay to Top Notch a management fee of $5,000.00 per month beginning in May, 2005, and each month thereafter until $25,000.00 is paid plus reasonable expenses to include lodging, food and transportation to be approved by Universal.
> Upon closing the final loan a total percentage of 10% will be split between mortgagee fees and expenses and Top Notch. All mortgagee expenses will be paid first and the balance of the 10% will be paid to Top Notch.
> 5. Term: The term of this Agreement shall be from the date hereof through the Grand Opening of the subject venue and continue with management until Universal has permanent management. Notwithstanding the foregoing, Universal may terminate this Agreement by providing Top Notch 30 days written notice. . . .
> 12. Modification: This Agreement shall not be changed, modified, or amended except in writing and signed by all parties.

(See Document No. 29).  (Emphasis added).

The contract called for Top Notch to be paid a maximum of $25,000.00. Top Notch was paid $25,000.00. (See Beasley affidavit). The contract also calls for Top Notch to be paid some portion of 10% of "the final loan" after "mortgagee expenses" are paid. Top Notch was terminated before any "final loan." Top Notch contends that it arranged financing with Compass Bank, CitiBank and Creative Equipment Funding (CEF). (See response to Interrogatory No. 11, P. 9; See response to Interrogatory No. 12, P. 10; See response to Interrogatory No. 13, P. 11-12). Defendants have obtained no financing, either permanent or temporary, from any of these entities and will not in the future. (See Beasley affidavit). Affidavits from representatives of Compass Bank and CEF disprove Top Notch's contention that any financing was arranged. (See Hertenstein and Shields affidavits).

Top Notch contends that it is entitled to $60,000.00 based on approval of "a $600,000.00 loan" by Brady Distributing Company. (See response to Interrogatory No. 14, P. 12-13). In fact, Brady Distributing Company never made a guaranteed loan commitment. Brady was going to take an application submitted by Universal City to its bank and let the bank make the decision. Any loan would have required the approval of Brady's bank, the personal guarantees of Fred and Mrs. Beasley and a down payment of $120,000.00. (See affidavit of James G. Smiley, III.).

Fred Beasley, Manager of Universal City, LLC, terminated Top Notch on August 30, 2005. (See Complaint; See response to Interrogatory No. 10, P. 8; See e-mails attached to Document No. 46 and labeled as Exhibit "3" to that document). Top Notch admits that it did

nothing after that date for which it was entitled to compensation.

## COUNT II.  INTERFERENCE WITH BUSINESS RELATIONS

Paragraph 67 of the Complaint appears to be the only allegation touching on any "Interference With Business Relations." It states that "Defendant (sic) has or may have attempted to do one or all of the following: (1) called on various customers of Top Notch; (2) provided misleading, false and inaccurate information to current customers of Top Notch; (3) provided misleading, false and inaccurate information to others about Top Notch; (4) possessed various documents and other property that lawfully belongs to Top Notch; and/or worked and done acts to damage and destroy the business and reputation of Top Notch."

Plaintiff was asked in Interrogatory No. 16 to identify each customer contacted by Defendants and specify each item of "misleading, false and inaccurate information" which constituted a tortious interference with business relations. The answer of Top Notch basically stated that Defendants informed vendors, etc., that Top Notch was terminated and could no longer do business for Defendants. (See response to Interrogatory No. 16, P. 15-16).

Top Notch states in the answer to Interrogatory No. 16 that "a current customer of mine named Sharon Ringgenberg was called and informed about alleged problems between Fred and myself." In fact, Fred Beasley called a lady in California, Sharon Ringgenberg, when papers with her name and phone number were found in the apartment vacated by William Brew. Beasley asked Ms. Ringgenberg if she wanted those papers. Interestingly,

Ms. Ringgenberg informed Beasley that Brew had told her that Beasley was going to invest a large sum of money in a project Brew was putting together for her. Beasley had never heard of this lady. (See Beasley affidavit).

Top Notch was asked to identify each individual or business contacted and to identify each item of "misleading, false and inaccurate information" communicated to that individual or business. Top Notch did not identify a single item of "misleading, false or inaccurate information." (See response to Interrogatory No. 17, P. 16).

Top Notch was asked to identify which acts by Defendants were done to "damage and destroy the business and reputation of Top Notch." Its answer is basically that Defendants breached their contract. (See response to Interrogatory No. 18, P. 16).

## COUNT III.  VIOLATION OF ALABAMA'S TRADE SECRETS ACT

Top Notch was asked to identify with specificity what trade secrets Defendants are alleged to have disseminated and to whom it claimed these trade secrets were disseminated. Its reply did not identify a single "trade secret." Its reply did not identify any individual to whom any "trade secret" was disseminated. (See response to Interrogatory No. 20, P. 17).

Fred Beasley and Universal City, LLC have not used any "systems, techniques, processes, patterns of practice, drawings, layouts or other specialized information" developed or furnished by Brew or Top Notch. The "business plan" developed by Top Notch was worthless as an aid to lenders. (See Hertenstein affidavit). No drawings, etc., are being used by Defendants now nor have they been used in the past. (See Beasley affidavit).

## COUNT IV.  QUANTUM MERUIT

Top Notch was asked to identify all of the "numerous additional services" it provided in addition to those called for in the contract.  Its response is in the first person and almost incoherent.  However, it seems to describe tasks which are specifically called for in the contract.  Unfortunately, Mr. Brew seizes upon the response to this Interrogatory as an opportunity to vent and slander Fred Beasley.  Even so, no compensable "additional services" are identified.  (See response to Interrogatory No. 15, P. 13, 14, 15).

### STANDARD OF REVIEW

The legal standard for summary judgment is well settled and well known to the Court.  Summary judgment is appropriate if this court finds that there exists no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.  F.R.C.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Turnes v. AmSouth Bank, N.A.,* 36 F.3d 1057, 1061 (11th Cir. 1994).  A dispute of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).  If the non-movant's response consists of nothing more than conclusory allegations, the Court must enter summary judgment for the movant.  *Peppers v. Coates*, 887 F.2d 1493 (11th Cir. 1989).

On a motion for summary judgment, the Court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the non-movant.  *Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144 (1970); *Mize v. Jefferson City Board of Education*, 93 F.3d 739, 742 (11th Cir. 1996).

After the movant has met his burden of showing that no genuine issue of material fact exists, the burden then shifts to the non-movant to make a showing sufficient to establish the existence of an essential element of his claims, and on which it bears the burden of proof at trial. To satisfy this burden, the non-movant cannot rest on its pleadings, but must, by affidavit or other means, set forth specific facts showing that there is a genuine issue for trial. F.R.C.P. 56(e). If the non-moving party does not respond to a motion for summary judgment, the Court may grant a motion for summary judgment in favor of the moving party, assuming that the defendant's presentation is sufficient to justify the Court's conclusion. *Id.*

## ARGUMENT

## COUNT I.  BREACH OF CONTRACT

"To establish a breach of contract claim a plaintiff must show '(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance and (4) damages.'" *Hooper v. Columbus Reg'l Healthcare Sys.*, 2006 Ala. Lexus 297 (Ala. 2006; *Jones v. Alfa Mut. Inc. Co.*, 875 So.2d 1189, 1195 (Ala. 2003) (quoting *Ex Parte Coleman,* 816 So.2d 1080, 1085 (Ala. 2003)).

There does appear to be a valid contract in this case. No one disputes that the "Management Agreement" is valid. At one time, Top Notch contended that contract was amended by an unsigned "Contract Amendment." It is unknown whether Top Notch

-7-

continues to make that contention. Defendants have moved to strike this "Contract Amendment" and this Court has not yet ruled on that motion. However, the contract everyone agrees was valid was the "Management Agreement" signed by Brew and Beasley.

Top Notch contends that Universal and Beasley failed to perform under the contract thus breaching it. This is simply not supported by the evidence in this case. The contract called for Universal to do certain specific things, all of which it has done.

First, Universal agreed in Paragraph 3 to treat all materials prepared by Top Notch as confidential and not disclose, copy or share such materials without the consent of Top Notch. Top Notch cannot identify a single item about which Universal or Beasley have failed to follow the requirements of that paragraph. Fred Beasley has testified by affidavit that he and Universal have not violated any confidentiality requirement concerning any material prepared by Top Notch. In fact, Universal and Beasley have used nothing prepared by Top Notch.

Next, according to Paragraph 4, Universal is to pay Top Notch $5,000.00 per month until $25,000.00 was paid. In other words, Universal was to pay Top Notch a maximum of $25,000.00 in monthly payments. It is undisputed that Universal and Beasley paid this amount.

Paragraph 4 calls for Universal to pay 10% of an amount of "the final loan" to be split between mortgagee fees and expenses and Top Notch. Top Notch has calculated that, as a result of this sentence, Universal and Beasley owe it in the neighborhood of $350,000.00. Top Notch contends this even though it only worked with Universal and Beasley for four

months. Top Notch's calculation has no basis in law or fact. This 10% figure was to be determined "upon closing the final loan." Top Notch was fired over 14 months. ago. No final loan has been closed. Lenders who were in negotiations with Universal on this project when Top Notch was involved are not going to be part of the "final loan." No firm loan commitment was made during the four month period Top Notch and Universal operated under their contract. Any lender with whom Top Notch was dealing did not and will not be involved "upon closing the final loan."

The requirements stated above are virtually the only requirements of Universal and/or Beasley under this contract. These Defendants did not breach the contract and the elements of this cause of action are not present.

## COUNT II. INTERFERENCE WITH BUSINESS RELATIONS

In Alabama, in order to establish tortious interference with contractual or business relations a plaintiff much prove "(1) the existence of a contract or business relation; (2) the defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; (4) the absence of justification for the defendant's interference; and (5) damage to the plaintiff as a result of the interference." *Tom's Foods, Inc., v. Carn*, 896 So.2d 443 (Ala. 2004; *Ex Parte Awtrey Realty Co.,* 827 So.2d 104, 108-09 (Ala. 2001) quoting *Soap Co., v. EcoLab, Inc.* 646 So.2d 1366, 1371 (Ala. 1994).

The only "contract or business relation" referred to by Top Notch is that relationship

-9-

with the lady from California, Sharon Ringgenberg. It is undisputed that Beasley never knew about any business relationship between Top Notch and this lady. Her name and phone number were on papers found in Brew's apartment and Beasley called her to ask if she wanted the papers.

It is also undisputed that Beasley did not intentionally interfere with that business relation. On the contrary, when he was asked by Ms. Ringgenberg if he was investing a large sum of money in her project, he told her that he had never heard of her. At that point, she discovered that William Brew had lied to her when he told her that Beasley was an investor in her project.

All other individuals and businesses mentioned by Top Notch in its response to Interrogatory No. 16 are vendors and lenders. The facts are undisputed that Beasley informed these individuals and businesses that Top Notch was no longer working with Universal City. This is not tortious interference with a business relationship. It is essential to a claim of tortious inference with contractual relations that the plaintiff establish that the defendant is a "third party," *i.e.*, a "stranger" to the contract with which the Defendant allegedly interfered. *Tom's Foods, Supra* at 454 quoting *Atlanta Market Ctr. Management Co. v. McLane*, 269 Ga. 604, 608, 503 S.E. 2d 278, 282 (1998).

It is difficult to ascertain exactly what Top Notch's contention is in this regard based on its response to Interrogatory No. 16. Even so, it would appear to be complaining about Beasley's contact with Ms. Ringgenberg and the vendors and lenders with which Universal

-10-

had been negotiating. This does not constitute tortious inference with business or contractual

relationships.

## COUNT III.  VIOLATION OF ALABAMA'S TRADE SECRETS ACT

> "A person who discloses or uses the trade secret of another, without a privilege
> to do so, is liable to the other for misappropriation of the trade secret if:
> (1) that person discovered the trade secret by improper means;
> (2) that person's disclosure or use constitutes a breach of confidence reposed
> in that person by the other;
> (3) that person learned the trade secret from a third person, and knew or should
> have known that (i) the information was a trade secret and (ii) that the trade
> secret had been appropriated under circumstances which violate the provisions
> of (1) or (2), above; or
> (4) that person learned the information and knew or should have known that
> it was a trade secret and that its disclosure was made to that person by
> mistake." §8-27-3 (Ala. 1975).

A "trade secret" is information that "is included or embodied in a formula, pattern,

compilation, computer software, drawing, device, method, technique, or process."  §8-27-2

(1)b Code of Alabama 1975.

It is difficult to imagine what Top Notch could have generated which would have been

considered a "trade secret" under the law of Alabama.  When asked in Interrogatory No. 20

(P. 17) specifically what trade secrets were disseminated and to whom they were

disseminated, Top Notch was unable to either identify any "trade secret" or identify to whom

Defendants are alleged to have disseminated any "trade secrets."  Top Notch answered this

request for specifics by identifying its "trade secrets" as "the information I prepared for this

project."

Top Notch had no "trade secrets" as defined by the statute.  Fred Beasley has sworn

in his affidavit that nothing prepared at any time by Top Notch has been used in furtherance of this project. There is no violation of Alabama's Trade Secrets Act and this count is totally without merit.

## COUNT IV.  QUANTUM MERUIT

Recovery on a theory of Quantum Meruit arises when a contract is implied. *Brannan & Guy P.C., v. The City of Montgomery*, 828 So.2d 914 (Ala. 2002). When an express contract exists, an argument based on a Quantum Meruit recovery in regard to an implied contract fails. *Brannan & Guy,* 828 So.2d at 921.

Top Notch was asked in Interrogatory No. 15 (P. 13) to identify each and every "additional service" which would justify recovery on a theory of Quantum Meruit. Its president, William Brew, responded with an incoherent rant which went on for over two pages. Nothing in that answer would qualify as a compensable service and virtually every service it performed for the project was contemplated and enumerated in the contract between Top Notch and Universal.

However, this answer to a fairly standard interrogatory gives the undersigned pause because of what would appear to be a thinly failed threat of extortion in a response to discovery. In the second paragraph of the response to Interrogatory No. 15, Top Notch states "I was required to traveled (sic) with Fred Beasley to be his cover for his personal activities on the supposed business trips. I had to keep and maintain personal liaison secrets and other personal nonbusiness confidences he placed on me." As if this were not improper enough,

-12-

in the ninth paragraph of this rambling response to Interrogatory No. 15, Plaintiff states "Fred Beasley never told me that I would be required to cover for his adulterous behaviors."

Surely Top Notch does not believe that the activities it has described are compensable. In over 20 years of civil practice, the undersigned has never seen a response to an interrogatory like this one. It is hard to imagine why this was included in this answer and it is hard to imagine why an attorney would allow this to go out over his signature.

At any rate, Top Notch and Universal were parties to an express contract. Quantum Meruit must fail under this fact situation. Count IV, Quantum Meruit, has no more merit than the rest of this lawsuit.

## CONCLUSION

This case was ill-conceived. It would appear that no witness identified by the Plaintiff has ever been contacted by its president or its lawyer. No cause of action is supported by either the law or the facts. Summary judgment is due to be granted to Defendants on all counts.

Respectfully submitted this the _6_ day of November, 2006.

_____

**JEFFREY W. SMITH (SMI088)**
Attorney for Defendants
Universal City, LLC and Frederick Beasley, III

-13-

**OF COUNSEL**:
**SLATEN & O'CONNOR, P.C.**
Post Office Box 1110
Montgomery, AL 36101
(334) 396-8882
FAX: (334) 396-8880
E-Mail: jsmith@slatenlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have served a copy of the foregoing document upon the below listed counsel of record, by placing copy of same in the United States Mail, postage prepaid this the _6_ day of November, 2006:

Mark N. Chambless, Esquire
**Chambless & Math**
Post Office Box 230759
Montgomery, AL 36123-0759

_____
OF COUNSEL

F:\Gen Litigation\Universal City, LLC\Pleadings\MSJ Brief.wpd

-14-

# AFFIDAVIT OF FRED BEASLEY

STATE OF *Alabama*                  )
COUNTY OF *Montgomery*            )

Personally appeared before me, the undersigned Notary Public, in and for said County

and State, Fred Beasley who, after being duly sworn, did depose and state on oath as follows:

1.    My name is Fred Beasley. I am manager of Universal City, LLC. Universal

City and I have been named as defendants in Case Number 2:05 CV 996-WKW presently

pending in the United States District Court for the Middle District of Alabama. I make this

affidavit in support of a Motion for Summary Judgment filed in that case.

2.    I planned and still plan to open an entertainment complex in Montgomery,

Alabama. In Spring, 2005, William Brew told me that he had extensive experience in this

type business. In April 2005, I signed a contract termed "Management Agreement" on behalf

of Universal City. Brew, president of Top Notch Consulting, Inc., signed the contract on

behalf of Top Notch. That contract is the only contract signed on behalf of Universal City

and Top Notch. This contract has been supplied to the Court as an attachment to Document

No. 29. Brew proposed an amendment to which I never agreed and that I refused to sign.

3.    Pursuant to our contract, I paid Brew over $25,000.00 in addition to expenses

for April, May, June, July and August, 2005. During this time, it became apparent to me that

Brew was unable to do the things he had promised when we first discussed my project. In

addition, I was advised by other persons to be very careful in my dealings with Brew.

Finally, I learned that Brew was trying to negotiate sales commissions for himself with

vendors he was dealing with for Universal City.

4.      Because of all of these things, I terminated the contract between Universal City and Top Notch on August 30, 2005. I informed Brew of this termination on the telephone and through a series of e-mails. I attempted to send a certified letter to Brew several times but Brew refused to accept it. He finally accepted the letter in October, 2005.

5.      No lender made a firm loan commitment during the time Top Notch was under contract. My project is ongoing and no lender with whom Top Notch negotiated will be involved in the project. The final loan will not involve any lender with whom Top Notch negotiated.

6.      After Brew left Montgomery, my sister went to his apartment to clean it. She found a file containing the name and telephone number of a lady in California, Sharon Ringgenberg. I called Ms. Ringgenberg to ask if she wanted the papers. She could not understand why these papers were in Montgomery. After we had talked for a while, she asked if I was a professional athlete. When I told her that I was, she told me that William Brew had told her that I was going to invest in a horse farm project that he was putting together for her. It is my recollection that she believed I was going to invest $900,000.00 in her horse farm. I had never heard of her.

7.      Brew prepared a "Business Plan" while Top Notch was under contract. It was of no use in obtaining financing and another had to be prepared after I terminated the contract. No document, plan, drawing or thing of any description prepared by Brew or Top Notch has been used or will be used in my project. I have given no one any document of any

description prepared by Brew or Top Notch.

**Further affiant sayeth not.**

_____
FRED BEASLEY

STATE OF _Alabama_ )
COUNTY OF _Montgomery_ )

I, the undersigned, a Notary Public in and for said State and County, hereby certify

that FRED BEASLEY, whose name is signed to the foregoing Affidavit and who is known

to me, acknowledged before me on this day that, being informed of the contents of the

instrument, he executed the same voluntarily.

Given under my hand and official seal on this the _6th_ day of November, 2006.

[SEAL]

_____
NOTARY PUBLIC
My Commission Expires: _8/20/07_

## UNITED STATES DISTRICT COURT for the
## MIDDLE DISTRICT of ALABAMA

TOP NOTCH CONSULTING, INC.                    )
                                              )
    **Plaintiff,**                             )
                                              )
                                              ) CASE NO.  2:05-cv-996-MHT
                                              )
UNIVERSAL CITY, LLC.; and                     )
FREDERICK J. BEASLEY, III                     )
                                              )
    **Defendants.**                            )

### ANSWERS AND SUPPLEMENTAL ANSWERS TO DEFENDANT'S
### FIRST INTERROGATORIES AND REQUEST FOR PRODUCTION.

Comes Now, Top Notch Consulting, Inc., and hereby responds as follows:

### INTERROGATORIES

#### QUESTION:

1.    Identify by name, social security number and date of birth, the individual who answers these interrogatories. Provide legible copies of all documents referred to or consulted in providing responses to these interrogatories.

#### RESPONSE:

1.    The interrogatory questions propounded to Top Notch Consulting, Inc are being answered by its managing member, William Edward Brew. William E. Brew was born on April 12, 1961. The Federal Taxpayer Identification Number for the Plaintiff, Top Notch, is: 87- 0766384. William Edward Brew is not required to provide his personal social security number to Defendants and the same is protected by Federal Law. William Brew is not a party to this action. The contract involved in this matter and the parties to this lawsuit are: Top Notch Consulting, Inc.; Universal City, LLC and Frederick J. Beasley, III.

#### QUESTION:

2.    Specify where and when "Top Notch Consulting, Inc." was incorporated and when it ceased to do business if it no longer does business.

#### RESPONSE:

1

2.      Top Notch Consulting, Inc. was incorporated May 1, 2003 in the State of California. The company is still in business and has not "ceased to do business". The attorney for Defendant stated that I was lying about this point but the corporation is still active and in business. Due to the acts of Frederick Beasley and Universal City, LLC, Top Notch has not been paid the funds due under the contract dated April 28, 2005 and Top Notch has not been able to pay its corporate franchise taxes for the year 2005 but remains an active corporation as I understand the term. Attorney Jeffery Smith said that, "I was lying", but my business is still active. (See Attachments)

**QUESTION:**

3.      Identify by style, case number and jurisdiction each and every civil or criminal action naming Top Notch Consulting, Inc., William Brew or any other business entity in which William Brew had a controlling interest in the last ten (10) years. Provide a legible copy of all Complaints, Answers, Indictments or Information pertaining to said actions.

**RESPONSE:**

3.      Any and all documents in my possession or in the possession of Top Notch Consulting, Inc. have been copied and provided to the Defendant. This is a request to produce and the Plaintiff produced copies of the documents in its possession on March 13, 2006 and again on April 10, 2006 and has produced the documents again for the third time. All documents in my possession have been produced. Instead of marking the documents civil suits, the documents will be marked Question 3 so that they can be more easily identified by counsel.

**CIVIL CASES filed against William Brew are as follows:**
City of Oakland v William Brew 2001-029567
City of Oakland v William Brew 2001-032896
City of Oakland v William Brew 2002-063965
National Credit Union Administrative Board v. William E. Brew RG 2004- 158980
Larry Flick dba The Floor Store v William Brew RSC 2005-0662
Larry Flick dba The Floor Store v William Brew RSC 2005-0658

**CIVIL CASES filed against Top Notch Consulting, Inc.**
No cases ever filed against Top Notch.

**CRIMINAL CASES against Top Notch Consulting, Inc and Willaim E. Brew**
No criminal case has been filed against Top Notch.
No criminal case has been filed against William Brew.

**QUESTION:**

4.      Provide a complete and comprehensive list of all clients, to include addresses and telephone

2

numbers, serviced by Top Notch Consultants, Inc. in the "entertainment and restaurant business" in the five (5) years preceding April, 2005.

**RESPONSE:**

4.  The clients I have worked with over the past five years are as follows:
    Greg Lyons, 1999 Harrison Street, Oakland, California, 94612.
    Khari Flowers, Richmond, California
    Dwayne McArthur, McArthur Tours and Transportation, Oakland California
    Carol England LasVegas Nevada
    Michael Smith Walnut Creek California.
    Sharron Ringgenberg, Mill Valley , California
    Joe Williams, Alameda Housing Group Oakland California.

**QUESTION:**

5.  If "Top Notch Consulting, Inc." contends that it engaged in any business other than the "entertainment and restaurant business" in the past five (5) years, identify its clients (to include addresses and telephone numbers) and identify the business in which said clients were engaged.

**RESPONSE:**

5.    Top Notch does not contend it engaged in any other business. The attorney has questioned me about Sharron Ringgenberg and business transactions with this person. Sharron Ringgenberg has paid no fees, commissions or other payments to Top Notch. Top Notch has not performed any services for Sharron Ringgenberg that involve any other business.

      Again, Top Notch does not contend that it engaged in any business other than the, "entertainment and restaurant business".

**QUESTION:**

6.  State with specificity what education, experience and special expertise qualifies William Brew and/or Top Notch Consulting, Inc. to consult clients regarding the "entertainment and restaurant business."

**RESPONSE:**

6.    I have attended college and graduated with BS. I have a minor in speech. I was a college athlete and traveled extensively during my college. Following college I was involved with various businesses and training through these businesses. With each of these businesses, I was required to travel, market and entertain clients and customers.

3

I established my first business in 1997. This was a billiards and entertainment center and offered food and beverage services. I established this business myself. Every aspect of starting, opening, running and maintaining the business was under my control and supervision. After opening the business, I managed the day to day operations of the business.

I established a sports bar in the year 2001 named Brews Sports Bar. This was a general restaurant and entertainment center and offered food and beverage services. I established a restaurant, bar, television, and entertainment center at this facility. This was a new concept and offered facilities to draw in patrons from lunch until the late hours of night. Both families and single persons were drawn in to this facility. I established this business myself. I set up this business, hired all the employees, selected the entertainment games and features, and ran the business myself. I spent hundreds and thousands of hours at the business. Every aspect of starting, opening, running and maintaining the business was under my control and supervision. After opening the business, I managed the day to day operations of the business.

The first business that I did not own completely and that I consulted and assisted in establishing as a consultant and part owner was another sports bar known as The Coaches Corner in the year 2003. I assisted in every aspect of establishing and opening this business. Every aspect of starting, opening, running and maintaining the business was under my control and supervision. After opening the business, I also assisted with the day to day operations of the business.

Each of these businesses established specialized education, experience and expertise in the food, service, entertainment and restaurant businesses. Each had unique start up and operating decisions to be made and added additional knowledge to me. Each day to day operating decision that had to be made added to my knowledge.

The concepts I created at Billiards Entertainment Center and at Brews is what attracted Mr. Beasley. Mr. Beasley frequented Billiards Entertainment Center and Brews. He came there several times and I considered him to be a regular customer. He frequently stated that he liked the business concept I created and that the idea would work in other cities. The opening of each of these business created special client contacts, knowledge, expertise and training.

**QUESTION:**

7.   Provide a complete copy of the "business idea, plan and concept" referred to in the Complaint created by Top Notch Consulting, Inc. and "its owner" William Brew in California. This interrogatory calls for any documents developed by Brew and/or Top Notch and an itemization of "time, effort and personal investments" referenced in paragraph 8 of the Complaint.
**RESPONSE:**

7.   The most recent update to the business plan is maintained in the computer of Universal. The copy that I have in my records was not the most recently updated copy. All original information and all computer information remains in Montgomery in the possession of the Defendants. The copy

4

that I have was produced in march and again in April and again here. I have is attached previously and marked "Business Plan". These were produced in detail and I provided 100's of additional documents in reply to this request. To say that I did attach the documents requested simply shows that the attorney did not bother to review the hundreds of documents requested and produced. The documents have been produced and will be produced again. The business plan was produced and marked "business plan" in the April 2006 responses and is attached again but marked Question 7, Business Plan so that the attorney can locate and identify.

As the lawyer calls me a liar again by stating that the business plan was not attached. It was attached to the first discovery, it was attached to the second discovery and is attached again in the same form and again in a separate folder so that it can be easily identified. The documents in my possession have been provided two times and now a third. I have searched my files and records and I have produced each and every document in my possession concerning this project. Every single document I have, and that can be located has been produced. The attorney said on March 15, 2006 that the business plan was not produced and this is just not true. I have not lied to the attorney nor this court.

In addition to the business plan, I produced every other document in my possession in the same manner as which it was stored. Every document provided was an original. I obtained every record that I had on this project and shipped the same to my Attorney, Mark N. Chambless. I have been informed by my attorney that he simply delivered the originals to Attorney Jeffery Smith in the same box. The business plan was in a file that was marked, "BUSINESS PLAN". There were at least 10 other files clearly marked and all originals were provided. I do not know what Attorney Jeffery Smith means when he alleges that the items were, "NOT ATTACHED".

**QUESTION:**

8.    Provide legible copies of "all materials prepared by Top Notch" referenced in paragraphs 18-21 of the Complaint which you contend Defendants have used and continue to use. Specify which of these documents Plaintiff contends are "confidential."

**RESPONSE:**

8.    Each and every document prepared or acquired by Top Notch and made or used in this project are considered the intellectual property of Top Notch as per the contract. All such documents are considered confidential and can not be used without the written permission of Top Notch which has not been granted to Universal, Frederick Beasley nor Ken Anderson. The Plaintiff is producing numerous bate stamped documents and each is considered confidential.

This answer includes the same items as provided in response to question 7 above. In addition to the items I have produced, there were hundreds of additional original documents left at the business location when I left that are a part of the records of this business transaction. I did not take the primary business plan as it was never printed and is in the computer of Universal. Many

5

hundreds of originals remain in the possession of Universal. Many originals remain in the possession of the vendors we were using. Almost all of the information was saved in the computer of Universal and the information remains in Montgomery in the possession of the Defendant. Any and all documents and papers in my possession on the project have been produced.

The business plan and concept was developed from Brews. There was no final draft of the business plan as it was being developed for financing and was under development the entire time the project was moving forward. The equipment selections were not made until the month of August. There was no construction price and many other costs and expenses were not known prior to August. The business plan that was being used was sufficient to obtain $3,100,000.00 in financing.

The business plan was continuing in its development as the project and the financial costs were becoming known. With each new development or business costs becoming known, the business plan would be updated. On August 30, 2005, the important parties discuss finalizing many of the matters to close this project out. See the e-mail work list prepared following the teleconference. This document is located in the file marked 9 (e). The purpose of the business plan was to obtain financing and so the business plan was never completed so there is no final business plan developed as of August 30, 2005. Regardless of the complaints of Universal and Frederick Beasley as to the business plan, I was able to obtain over $3,000,000.00 in commitments. The most recent business plan is not in my possession as it is located in the Universal computer.

I contend that every single business record developed for this project and which I worked to complete, to develop or that was used on this project is confidential and protected by the contract entered between the parties.

**QUESTION:**

9.  State with specificity on what Plaintiff bases its allegation that Defendants have continued relationships with each of the following:
    1.  Compass Bank;
    2.  CitiBank;
    3.  Don Stansell;
    4.  Aronov;
    5.  Ken Anderson;
    6.  Brady Distributing Company;
    7.  Creative Equipment Funding, LLC;
    8.  Sandy Goodwin Brothers.

Identify with specificity what "materials previously generated by Top Notch" each of these entities and Defendants are using. Provide legible copies of said "materials."

**RESPONSE:**

9.  In response to question nine, I maintain that the project is still an ongoing business venture. The project did not end when I was terminated. All of the plans developed during the five months

6

of my contract are still being used to move the project forward. The equipment selections, vendors, financing agencies and other aspects of the project are still in use. The attorney asks me for specific information as to what I base my allegation that Defendants have continued the relationships. Each of the vendors I organized, contacted and utilized to formulate the business plan for Universal are still being utilized. I have no information that any person involved in ths project has been terminated other than myself. I understand that the project is proceeding and is to be opened in Montgomery.

I have a file on each of the persons or businesses listed in question nine and I have produced the original file in my possession. As to each person or business listed in the question. I state as follows:

Following the oral demand made to me by Frederick Beasley on August 30 to vacate the rental property and additionally his oral notice to terminate the contract, I have discussed the project with several of the persons or businesses involved in the project. Each person or business, that I contacted or that contacted me that is set out on the list in this question, has informed me that the project is still ongoing, proceeding and that the plans have not changed or that the plans are similar to or identical to the plans developed by Top Notch. It is my understanding from these persons or businesses that the persons and businesses involved, the designs, the overall program, the furniture and business layouts and the equipment selections, remain unchanged. Through my efforts, approximately $3,410,000.00 in loans had been approved and secured to fund this project. This occurred despite the assistance of Mr. Beasley. It is my understanding that the same businesses and persons set out on the list in question nine remain involved in the project and remain willing to close the loans if the appropriate documents are delivered. In fact some of the commitments run through the year 2006. Since I have left Montgomery, I have been informed of the above facts by the following persons and or business representatives: Ken Anderson, Wendy and Rob from Compass Bank, Steve Wallace, Joe Bohannon, Kyle, Don Stansell, and Sandy Goodwin.

It is my understanding from these conversations with the above mentioned persons, that all of the materials, documents, equipment, designs, layouts, vendors, suppliers, architects, landlords, sign professions, bankers, and other contacts developed by Top Notch and created for this project are still in use and being used by each of the above parties including Universal and Frederick Beasley. Each of the documents prepared during my time on the project out the intellectual property of Top Notch and the use of the same is prohibited.

To supplement this, each of the items produced and attached in response to question 7 above have been used and are continuing to be used on this project. I have attached files for each of the persons or business listed in question 9 and the same are attached in response to question number seven. The files are named by the vendor. Each such document contained in the file was produced through the efforts of Top Notch and are subject to the terms of the contract. I provided individual files clearly marked with the names of the companies or person set out in this question for the attorney to review. Again, he choose not to review and simply inform this court that I did not reply. Again, I inform this court that I have replied to the best of my ability and that the information requested has been produced and is being produced again.

7

I have previously marked the files Compass, Citibank, Don Stansell, Aronov, Brady, CEF (which is Creative Equipment Funding, LLC) and Goodwin (which is Sandy Goodwin Brothers). I do not have a separate file for Ken Anderson. I have created a file for him per this questions request. I do not know how to mark in another manner so that the attorney can locate but will add to the name on the file 9 (a), 9 (b), 9 (c), 9 (d), 9 (e), 9 (f), 9 (g) and 9 (h).

Each of these files has information that was gathered and used to create this project. In addition, I provided many other files that also contain the information that was gathered, developed and used to create this project. All of this information is the product of Top Notch and is still being used to the best of my knowledge. I have not been privy to any ongoing project information since August 30, 2005. I believe that all of the information attached is still being used by the Defendants.

> 9 (a) Compass— see file
> 9 (b) Citibank— see file
> 9 (c) Don Stansell— see file
> 9 (d) Aronov — see file
> 9 (e) Ken Anderson — see file
> 9 (f) Brady Distributing Company — see file
> 9 (g) Creative Equipment Funding, LLC (which is CEF ) — see file
> 9 (h) Goodwin (which is Sandy Goodwin Brothers) — see file

**QUESTION:**

10. In your Complaint you state that Top Notch was notified of its termination on August 30, 2005 by telephone. Do you contend that this was the only notification of termination you received before October 8, 2005? If so, state specifically each and every action for which you contend you should have been compensated by Defendants after August 30, 2005.

**RESPONSE:**

10. The contract prepared by Frederick Beasley's attorney and the attorney for Universal and signed by the parties requires 30 days <u>written notice</u> of termination. The contract requires the payment of $5,000.00 per month until such time. The written notice of termination prepared by Fred Beasley was delivered to me on behalf of Top Notch on October 8, 2005. (See Exhibits, Marked 10).

The amended contract signed by me for Top Notch, but not signed by Universal, required monthly payments until the contract was cancelled. I was not paid in September, October or November. I am due $15,000.00 for these monthly payments, plus 10% of the loans secured, plus damages for breach and those damages set out in the complaint.

The only written notice of termination that was delivered to Top Notch was received on the date stated above. On August 30, 2005, Frederick Beasley told me he intended to terminate the contract, and further demanded that I immediately vacate the apartment and stop working on the project.

8

## QUESTION:

11.  Specify each and every act done by you in assisting Defendants in obtaining a loan from Compass Bank. This interrogatory calls for you to identify each communication between you and any representative of Compass Bank and the date on which said communication was made. Provide legible copies of all writings of any description which evidence any assistance in obtaining this loan.

## RESPONSE:

11.  During the course of seeking out financing requested by Fred Beasley after I arrived in Montgomery for this project, I was referred to Compass Bank by Steve Wallace. I met with Rob Hertenstein of Compass. I was instructed to complete numerous bank forms for the application for credit. These forms were normal bank loan forms. The package that was provided to me to complete was forwarded to Frederick Beasley to assist. This was the standard practice for loan applications. I would obtain the forms and complete and either forward to Fred to sign or sign for him and follow up. If there was information needed to be gathered by Fred, I would forward the application to Frederick Beasley to assist. Compass requested that the current business plan be delivered as a part of the loan application. This was in May and we did not have any sort of business plan then. This was the first month I was in Montgomery and this loan was to be a operating loan. I could not believe that it was very hard to get even an operating loan of $100,000.00. It took much effort to obtain. I had to prepare a rough draft of a business plan obtain all of Fred's financial information and work almost round the clock to get this very small loan.

I accumulated all of the necessary documents and forwarded to Compass. I followed up on every aspect of the application until the operating loan was approved. The loan in the amount of $100,000.00 was approved and paid in July 2005. The contract authorized a 10% commission or $10,000.00 to Top Notch. This was not paid. Compass was negotiating a $900,000.00 loan as well. Wendy told me that the loan was approved but that she could no longer discuss loan with me.

I performed all duties necessary to see that the loan application was filed and made ever effort to see that a loan was approved. Fred Beasley has all of the loan documents in the files left in the business office of Universal. Based upon my efforts, Compass Bank funded the loan in the amount of $100,000.00 for this project. Compass informed me that the primary loan for this project would be approved upon the completion of the appropriate documents. I was terminated before the final loan documents were submitted for approval. My primary communications with Compass Bank were through Rob Hertenstein and Wendy. I made many many calls to Compass and may have spoken to other persons whose names I do not recall at this time. I do not recall specific communications or dates of these but I do have a file and the same is being produced. Specific letters, e-mails and other communications should be in the computer. Each and every conversation I had with representatives of Compass were for the business purpose of obtaining a loan for this project.

9

I will add here that in all of my discussions and conversations with Frederick Beasley leading up to the decision I made to come to Alabama and leave my family for six or more months, Frederick Beasley never informed me that he was having financial problems. He never informed me that the project financing would have any difficulty or that obtaining funds would be difficult and require my complete attention. I was lead to believe the exact opposite. In fact, my understanding was exactly the contrary, that I would have to prepare and complete a basic and simple business plan, complete loan application documents and simply apply for financing using the credit rating and credit history of Frederick Beasley who was a National League Football player for many years. I was further lead to believe that he had the funds and or the financial ability to finance the project quickly and the primary focus would be the economic feasability of the project, selecting a location and equipment and opening the business. This is why we needed a business plan. This turned out to be completely false. Ever aspect of financing this project was difficult, in fact it was difficult to even obtain operating funds of $100,000.00. I was lead to believe that the project funding would not be an issue.

See file marked Compass Bank and also marked 9 (a).

### QUESTION:

12.     Specify each and every act done by you in establishing a "business relationship" between Defendants and CitiBank. This interrogatory calls for you to identify each communication between you and any representative of CitiBank and the date on which said communication was made. Provide legible copies of all writings of any description which evidence a promise on the part of CitiBank to provide Defendants with $831,000.00.

### RESPONSE:

12.     This answer is similar to that of number 11 above. I made every effort to obtain a loan from CitiBank to fund this project. I was instructed to complete numerous loan forms for the application for credit. These forms were normal mortgage loan application forms. The package that was provided to me to complete was forwarded to Frederick Beasley to assist. I would obtain the documents and then forward to Frederick Beasley to assist. The documents that I have for this vendor have been produced. I used my personal contacts with CitiBank to set up and establish this relationship. CitiBank issued a $45,000.00 line of credit to Frederick Beasley. He paid Top Notch the agreed upon 10% of this loan.

I worked with Marshall Kido at CitiBank to obtain this loan approval. I performed each required task and provided the necessary information to Marshall Kido of CitiBank. The loan applications were approved on June 16, 2005. We received multiple letters approving the transactions. The letters are in the file marked 9 (b). Also a letter was mailed to Fred Beasley to follow up and schedule the closing on or about June 17, 2005. From June 17, 2005 until I was terminated on August 31, 2005, Fred Beasley did not follow up or perform the necessary duties to see that the mortgages closed. These multiple mortgage loans were approved

10

I performed all of the duties necessary to see that the loan application was filed and I made ever effort to see that a loan was approved. Fred Beasley has all of the loan documents in the files left in the business office of Universal. Based upon my efforts, CitiBank approved a loan in the amount of $831,000.00 for this project. I contacted all of the necessary persons to see that the loan process was started and followed up on all aspects of the same to completion. This was a complicated loan as it would have been a mortgage loan with several properties involved in a refinance that would result in cash back to Mr. Beasley for the project. I did speak to several different persons to see that the mortgage loan would be approved including appraisers and other such persons. I do not recall specific calls or dates of these calls but there is a file that is being produced and there is a file in the possession of Universal. There are also computer records for each of these in the possession of Universal. The records are in the file and in the computer. Top Notch is entitled to $83,100.00 in commissions as set out in the contract. This was not paid.

Citi agreed to a new mortgage loan that would allow Mr. Beasley to be paid $831,000.00 cash at the closing. All documents are in the possession of the Defendants. I have attached any copies of the same that I have. I dealt extensively with Joe Bohannan and Marshall Kido on this part of the project and had many conversations with each. This was a very important part of the funding of this project as this would have allowed Fred to receive cash money to run the project and operate the first few months. This loan process was very difficult as it was difficult to obtain the necessary information from Mr. Beasley and the loan required me to sell Citi on the project itself despite the loan being a mortgage. Specific letters, e-mails and other communications should be in the computer.

From May until August 30, I worked at least 8 hours per day on this project to see that the restaurant was opened. I generally spent much more than 40 hours per week to see that the project was completed and opened. Fred has access to the telephone records and these will show the number of calls to each vendor or potential bank, equipment provider, bank or loan company.

I do not recall specific communications or dates of these but I do have a file and the same is being produced. Each and every conversation I had with representatives of CitiBank were for the business purpose of obtaining a loan for this project. The file contains a letter that states that the loan had been approved. See file marked CitiBank and also marked 9 (b).

**QUESTION:**

13. Specify each and every act done by you in establishing a "business relationship for Universal with Creative Equipment Funding, LLC." This interrogatory calls for you to identify each communication between you and any representative of Creative Equipment Funding, LLC and the date on which said communication was made. Provide legible copies of all writings of any description which evidence approval of $1,500,000.00 equipment leasing line of credit for Universal.

11

**RESPONSE:**

13.     Same as 11 and 12 above. I worked extensively with Chris Shields and Bill from Creative Equipment Funding, LLC. I established a good relationship with this company as they would be the primary loan source for the equipment and most of the equipment needed by the business to open. I negotiated a lease purchase arrangement with Creative. The equipment costs for a project like this are very high as the games and other entertainment machines are very expensive. See the Brady file and the Goodwin Brothers file which contain the equipment estimates. These games draw persons into the facility and act as a primary marketing tool for the business. It was critical to obtain as much money as possible to purchase the very best equipment and exciting gaming machines. I had negotiated a $1,500,000.00 line of credit on a lease purchase arrangement. This was approved on August 22, 2005, just eight days before my termination. This line of credit would allow Universal to purchase almost all of its kitchen equipment, furniture and fixtures and amusement machines. Pursuant to the contract, Top Notch was entitled to the sum of $150,000.00. This was not paid.

    I do not recall specific communications or dates of these but I do have a file and the same is being produced. Each and every conversation I had with representatives of Creative were for the business purpose of obtaining a loan for this project. Specific letters, e-mails and other communications should be in the computer. The file contains a letter stating that the loan or lease purchase agreement had been approved. See file marked CEF and also marked 9 (g).

**QUESTION:**

14.     Specify each and every act done by you in establishing a "business relationship for Universal with Brady Distributing Company." This interrogatory calls for you to identify each communication between you and any representative of Brady Distributing Company and the date on which said communication was made. Provide legible copies of all writings of any description which evidence approval of "a $600,000.00 equipment leasing and purchasing line of credit for Universal."

**RESPONSE:**

14.     Same as 11 and 12 and 13 above. My primary contact at Brady was Larry E. Cooke. We meet with him in North Carolina at his office. I also consulted with Ken Anderson and Birmingham Vending on this aspect of the project. The final approval letter was issued by James G. Smiley, III. Brady was to supply the entertainment and amusement equipment. Brady had approved a line of credit loan in the amount of $600,000.00 due to my efforts.

    I recall many conversations with Brady and those persons listed above in regards to selecting amusement equipment. We discussed the layouts, the type equipment, the number of games, videos machines and every other aspect of selecting and finalizing the number, placement and layout of each piece. I recall working with them extensively on budgets for the equipment, selecting specific machines or games and dealing with Brady through the final approval. I do not recall specific communications or dates of these but I do have a file and the same is being produced. Each and

12

every conversation I had with representatives of Brady personnel were for the business purpose of obtaining a loan for this project. Specific letters, e-mails and other communications should be in the computer. The file contains a letter stating that the loan or line of credit agreement had been approved.

I was informed the last week of August that Brady approved a $600,00.00 loan. I requested a verification letter and that was delivered to me by facsimile on August 31, 2005. Top Notch is entitled to be paid a commission of $60,000.00 per the contract. See file marked Brady and also marked 9 (f).

**QUESTION:**

15.   Identify each and every "numerous additional services" Top Notch has provided for Defendants in addition to " duties required in the original contract."

**RESPONSE:**

15.   I met with hundreds of persons and made thousands of calls on this project. I worked on every aspect of starting, opening and running this business. I met with Realtors, kitchen specialists, equipment vendors, gaming vendors, lighting specialists, sign professionals, City, County and State officials, lawyers, carpet professionals and many others. I met with every kind of person to see that this business opened. I worked on plates, glasses and napkins for the business.

I was required to traveled with Fred Beasley to be his cover for his personal activities on the supposed business trips. I had to keep and maintain personal liaison secrets and other personal non-business confidences he placed on me. I was misled from the first time we meet to discuss the project in Montgomery. I was misled about Mr. Beasley's personal finances in that he informed me he had the finances to open a $3,000,000.00 facility. From the first day he asked me about helping him, he informed me that the facility would be a $3,000,000.00 facility. I was never informed that anything in regards to the financing would be required of me other than applying for the loans necessary to open the business.

My agreement to come to Alabama and leave my family for six months was based upon the promise of 10% commission on the sum of $3,000,000.00. This understanding and agreement was the basis of our written agreement. In fact, every loan obtained was difficult to arrange including the $100,000.00 loan from Compass. I spent almost all of my time simply trying to find a bank, business or finance company that would provide the funds for this project.

I had to do many, many personal favors for Fred and his family. I had to deal with his family, spouse, children and relatives daily. All the while, he would complain if I tried to spend one moment or any time with my family in California. Mr. Beasley complained openly to me and others about me spending one week vacation with my family during the entire summer of 2005. Mr. Beasley complained that I used the automobile provided to me for personal use while knowing my car was in California.

13

I met with Sandy Goodwin and I met with hundreds of people, made hundreds of calls to establish this business and create a plan that would work in Montgomery. I spent hundreds of hours with architects, Realtors, sign designers, establishing the corporation and meeting with Mr. Beasley's attorney Randy Moore. I assisted in obtaining the liquor license, dealing with state, city and county officials on this project. I had to learn about the Alabama ABC board and its representatives.

I established marketing contacts and insurance contacts. I established graphic designs, logos and other print information. All these efforts were made in contemplation of the 10% percentage promised me. All the while Fred intended to get all the way down the road and within weeks of opening and then fire me before any loan closing and stiff me on my fees.

I should have seen this coming when every vendor that had an open invoice was not paid and came to me complaining and requesting my intervention to get paid. When these persons were complaining, we had a difficult time obtaining the $100,000.00 loan. Mr. Beasley refused to pay his attorney fees and the architectural fees despite their excellent service to Universal and Fred. I have provided many documents that set out many, many other services performed. Attorney Smith says this answer is non-responsive but I consider all of these services as additional services as the agreement originally did not intend to require these services. It was my understanding that I would have to prepare a simple business plan emulating my California business. Complete loan applications. Create the business concept and layouts and select the equipment and open. This is not at all what occurred.

I have provided the best answer I can here. I am entitled to damages for breach of contract. Fred Beasley lied to me from the very first conversations we had. He lied as to what he intended to pay to me to compensate me for coming to Montgomery. He lied about his finances and the fact that he had the "money in the bank" to do this project. He never informed me that he did not have the financial means to secure the project funding. I agreed to prepare applications, loans, etc. based upon the statements of Fred Beasley that he had the financial statements to secure the loans required of approximately $3,000,000.00. He never told me that he did not have the personal resources to qualify for loans to fund the project, he just requested that I secure the financing using his personal financial information. This was not at all what was required and I had to use all of my abilities to arrange for financing this project through many different sources.

Fred Beasley never told me that I would be required to cover for his adulterous behaviors. He never told me I would have to perform personal services for his wife and children. He never informed me that I would have to do work projects at his house. He never told me I would have to spend most of my time organizing his financing and working full time finding finances for the project. He never told me I would have to work to get him to pay for the services purchased or ordered. He never told me I would have to work many hours just to get a $100,000.00 operating loan to keep the project moving. Again, I repeat, even though the attorney does not like my answer and demands additional information, I want to be compensated for the work I did in accordance with the contract. I want to be paid for the project as I was promised and as is set out in the first and amended contract. Fred told me he had the financing for a $2,500,000.00 to $3,000,000.00 dollar

14

facility and asked me to help set it up in exchange for 10% of the final facility cost. This was a lie and Fred knew this was a lie as he did not even have $100,000.00 to fund the project.

### QUESTION:

16.  Identify each customer of Top Notch contacted by Defendants and specify each item of "misleading, false and inaccurate information" communicated to said customer which constituted tortuous interference with business relations.

### RESPONSE:

16.  It is my understanding from a review of one email that each vendor on this project has been contacted and informed that I was terminated. Each vendor was informed that I would no longer be involved in the project and that they were not to deal with me further. Ken Anderson specifically wrote to me by e-mail and informed me that he was told I was terminated and not to discuss the project further with me. See the e-mail in the file marked 9 (e). Ken Anderson and Fred Beasley and Universal converted to their use the plans, designs, relationships, concepts, layout, equipment selections and the overall business plan that was developed by Top Notch to their personal use. These two have also converted to their personal and business use my business contacts I had established for this project. I have been informed that certain vendors were informed that I had been fired or terminated for cause. Each of these actions appears to have been taken by Fred Beasley and Universal to discharge me and take over the project in an effort to save 10% of the total project costs as set out in the contract. The Defendants did contact Sharon Ringgenberg, Don Stansell, Sandy Goodwin, Ken Anderson, Wendy and Ron at Compass, this is who I recall today.

Business loans, operating funds, lines of credit and lease purchase agreements totaling over $3,100,000.00 had been arranged. These loans were either closed, approved, pending or ready to close. I came to Alabama on the agreement I would be paid 10% of the $3,000,000.00 project or $300,000.00, when the project was funded and the loans approved. Fred Beasley called each of the contacts I established and informed them that I am a crook and I was fired. They were informed that I had been terminated before any notice was provided to me. Theses contacts were informed to conduct future business with Fred Beasley or Ken Anderson and not to listen to me. They were informed that all future contact should be through Fred or Ken. A current customer of mine named Sharon Ringgenburg was also called by Mr. Beasley and informed about alleged problems between Fred and myself. Fred told me he would put my name in the California papers if I sued him and did not drop my claim for compensation.

Ken Anderson and Fred Beasley took the plans and business plan developed by me and the contacts I established. Each person involved in this project was informed that I had been fired or terminated for cause. Each of these actions were taken by Fred and Universal to discharge me and take over project to save 10% after each loan that pending or closed. Ken and or Fred has called each of the contacts I established and informed them that I am a crook. They were informed that I had been terminated before any notice was provided to me. Theses contacts were informed to do business with Fred and Ken, not to listen to me. They were informed that all future contact should

15

be through Fred or Ken. A current customer of mine named Sharon Ringgenburg was called and informed about alleged problems between Fred and myself. Fred told me he would put my name in the California papers if I sued him and did not drop my claim for compensation.

**QUESTION:**

17.    Identify each other individual or business contacted by Defendants and specify each item of "misleading, false and inaccurate information" communicated to said individual or business which constituted tortuous interference with business relations.

**RESPONSE:**

17.    See 16 above. Each of the contacts made to the vendors involved in this project and the false statements made to them will prevent me from using these contacts in the future. Fred Beasley has tried in every way to damage my reputation and that of Top Notch with the vendors involved in this project. Each of the contacts made to the vendors involved in this project have prevented me from using these contacts in the future.

**QUESTION:**

18.    Identify each and every act which you contend Defendants have done to "damage and destroy the business and reputation of Top Notch."

**RESPONSE:**

18.    See 16 and 17 above. By not paying me per the contract, I have suffered major financial problems as seen in these requests. By requiring me to leave Montgomery on 1 days notice on the last day of the month and refusing to pay per the contracts, I have suffered severe financial distress and emotional distress. I was not provided 30 days written notice. I was not provided the monthly supplemental payment of $5,000.00 for the month of September. Mr. Beasley knew that the monthly stipend paid to me was used to pay my California mortgage and was necessary to my financial ability to pay my monthly bills in California. The acts were done intentionally by Frederick Beasley and Ken Anderson to harm me financially. The acts were done by Frederick Beasley to save money when the 10% commissions were now due and payable.

My family has suffered and my business has suffered due to Mr. Beasley providing me 24 hours notice of termination and no monthly payment for September or after. I have been sued in California due to the breach of this contract by Fred Beasley and Universal. I have had judgments entered against me in California and against my company due to the actions of Universal and Mr. Beasley

I set out the damages in the complaint and restate here. The complaint is in the possession of the defendants.

16

**QUESTION:**

19.   State with specificity all monetary loss, lost intellectual property, customer and vendor lists, price lists, procedure manuals, and other intellectual property rights, and [loss of] customers and business which you contend Defendants caused. Provide legible copies of any writing which would support your claim in this regard.

**RESPONSE:**

19.   See 16, 17 and 18 above. I set out damages in the complaint and restate here. I am due $15,000.00 for monthly contract payments. I am due at least $300,000.00 for commissions for loans, lines of credit and project costs and expenses that had been approved through the efforts of Top Notch. I am due damages as set out in the complaint for willful breach of contract. I am entitled to be paid for the wrongful use of my work product without my permission. I am entitled to damages for Mr. Beasley and Universal's interference with my business relationships and contracts. The documents developed by me on this project are protected work product and the use of the same by Mr. Beasley, Universal or any other person or business without my permission is a violation of Alabama Trade Secrets Act. The violation of this act allows punitive damages. All of the acts set out in the complaint have damaged me personally, financially and professionally.

**QUESTION:**

20.   Identify with specificity what trade secrets you claim Defendants have disseminated and to whom you claim these trade secrets were disseminated.

**RESPONSE:**

20.   The information I prepared for this project is the intellectual property of Top Notch as established by written contract. Each item of information developed was intended for use in this business but was information and intellectual property of Top Notch. The information contained systems, techniques, processes, patterns of practice, drawings, layouts and other specialized information. The information was not readily available to the general public. This information is the intellectual property of Top Notch. The information obtained and kept by Universal and Fred Beasley was obtained by breach of confidence, misrepresentation or conversion. All information and intellectual property of Top Notch retained and or used by Universal, Frederick Beasley or Ken Anderson or any other person for the benefit of Universal has misappropriated such information.

**QUESTION:**

17

21.    Provide copies of corporate income tax returns, both state and federal, for Top Notch
       Consulting, Inc. and individual income tax returns, both state and federal, for William Brew
       for the past five (5) years.

**RESPONSE:**

21.    No tax returns are not available for the years 2004 or 2005. William Brew is not a party to
this action. Tax returns will be provided when prepared.

**QUESTION:**

22.    Provide the name/address/telephone number of each witness you intend to call at the trial of
       this action with the synopsis of this witness' anticipated testimony.

**RESPONSE:**

22.    I expect the persons named in these answers will be called. I expect that each company that
       approved a loan will be called upon to testify. I expect that the following will be called to
       testify:

Ken Anderson
Wendy and Rob from Compass Bank
Steve Wallace, Aronov, 3500 Eastern Blvd. Montgomery, Alabama 36116.
Don Stansel, Post Office Box 240545, Montgomery, AL 36124
Representatives from Compass, Rob Hertenstein 3480 Eastern Blvd, Montgomery, AL 36116
Representatives from Citibank-      Joe Bohannon and Marshall Kido,
                                    37 Orinda Way, Orinda, CA 94563
Representatives from Aronov-3500 Eastern Blvd. Montgomery, Alabama 36116.
Representatives from Brady- 2708 Yorkmont Road, Charlotte, NC 28208
Representatives from CEF, 1450 Poydras Street, Suite 1505,, New Orleans, LA 70112
Representatives from Goodwin Brothers - Sandy Goodwin
Attorney Randy Moore
Attorney Greg Lyons
Frederick Beasley
William E. Brew

**QUESTION:**

23.    Provide an itemization, with supporting documentation, of all expenses you claim to have
       incurred on behalf of Defendants and note those expenses for which you received
       reimbursement verus expenses for which you claim you did not receive reimbursement from
       Defendants.

**RESPONSE:**

18

23.     These records have been produced or are currently in the possession of the Defendant. The records of all expenses are maintained in the computer and in a file that was left at the business. I have a copy of two checks paid to Top Notch in August and one check for reimbursement to William Brew in August. These records are attached and were attached in the original requests. Top Notch was paid for the months of May and June. William Brew was reimbursed for expenses in May, June and July. August expenses were not reimbursed. All checks are in the possession of the Defendant.

### QUESTION:

24.     State the name(s) of all attorneys, persons or entities who drafted or assisted in drafting the written contract you reference at paragraph 11 of the Complaint and provide the address and telephone number for such attorney, person or entity and for whom said individual was working at the time he or she provided such assistance.

### RESPONSE:

24.     Attorney Randy Moore. Attorney Greg Lyons. Mr. Fred Beasley. Mr. William E. Brew.

### QUESTION:

25.     Provide the date, source of payment, amount of payment and purpose of payment for all funds transferred to you from Defendants during all times relevant to the allegations of your Complaint.

### RESPONSE:

25.     These records are readily available to the Defendant as they have all the records. Any checks in my possession have been produced in response to this question. Top Notch was paid the monthly payment of $5,000.00 in May, June, July and August. Top Notch was reimbursed for expenses in May, June and July. Top Notch was paid 10% of $45,000.00 Citibank loan or $4,500.00.

### QUESTION:

26.     Identify the individual who signed Fred Beasley's name to the CEF Credit Application dated on or about July 27, 2005. Identify by what authority the individual signing Fred Beasley's name signed his name.

### RESPONSE:

26.     William signed this agreement at the direct of Fred Beasley. When the credit application was prepared, I called Fred Beasley to inform him of the application. We discussed the application and many other matters as well. I had completed all of the necessary forms and gathered up the information required for loan approval. When I asked if Fred wanted me to sign or fax to him he said, "Throw my name on there", "when originals come in, I'll sign". This was a credit application

19

for authorizing equipment financing. The final loan documents were prepared and forwarded to Universal address but the same had not been signed before August 31, 2005. I signed at the direction of Fred Beasley. I had standing authority to seek out funding for this project. I had possession of all information and tax returns and credit reports and all personal financial information on Fred Beasley. This information was used to obtain the financing for this project including the $100,000.00 loan. I had the standing authority of Universal and Fred Beasley to seek out and obtain credit funding for this project.

**QUESTION:**

27.　State with specificity all actions you took on behalf of Defendants which supports your allegation at paragraph 38 of the Complaint that you "fully performed the services required by the original contract up to and including September 2, 2005." As to each action, state the following:

　　　1.　The nature of the action taken by you;

　　　2.　The person or persons with whom you claim to have made contact;

　　　3.　The result of the action claimed by you.

**RESPONSE:**

27.　I do not understand this question. I did everything necessary to open this restaurant. This question asks me to state in writing everything I did over a five month period. I worked 40 to 75 hours per week during this time and made thousands of telephone calls and went to many different cities and meet with hundreds of persons. There is no way to answer this question in writing and is onerous. If I were to set out everything I did for the five months I worked with Universal it would take hundreds of pages to write. The proof is in the letters of credit and loan approvals. I spent many hours on this but this task was not even suppose to be a part of this project. I was told that Fred had the $3,000,000.00 to set up this project. My original agreement was to coordinate the project and open the same. I was never informed that I would be required to spend time obtaining financing. I was not then nor now a financier. Fred misrepresented the project to me from the start. I knew I could set up the business within five months but it turned out that there was no financing and most every aspect of this project was delayed due to the false representation made to me from the start. I fully performed to the best of my ability while Fred just misrepresented the facts to me from the start. I lost six months of my business life due to the false statements and misrepresentation of Fred Beasley. I have attached 100's of documents that show the actions I took on behalf of Universal. I arranged for financing of over $3,000,000.00 This question asks me to state in writing everything I did over a five month period.

　　I worked 40 to 75 hours per week during this time and made thousands of telephone calls and went to many different cities and meet with hundreds of persons. There is no way to answer this

20

question in writing and is onerous. If I were to set out everything I did for the five months I worked with Universal it would take hundreds of pages to write. The proof is in the letters of credit and loan approvals. I spent many hours on this but this task was not even suppose to be a part of this project. I was told that Fred had the $3,000,000.00 to set up this project. My original agreement was to coordinate the project and open the same. I was never informed that I would be required to spend time obtaining financing. I was not then nor now a financier. Fred misrepresented the project to me from the start. I knew I could set up the business within five months but it turned out that there was no financing and most every aspect of this project was delayed due to the false representation made to me from the start. I fully performed to the best of my ability while Fred just misrepresented the facts to me from the start. I lost six months of my business life due to the false statements and misrepresentation of Fred Beasley.

In regards to question 27. a., the project as first envisioned was a $3,000,000.00 project. I arranged financing in this amount. The services were fully performed through my termination. In fact, the financing was the primary nature of all actions I undertook. As I stated above, Frederick Beasley informed me that he had the ability to get the funds in the amount of approximately $3,000,000.00 and this was not true. We had to go to multiple companies and obtain lines of credit and multiple financing arrangements to obtain the needed funds of $3,000,000.00. All actions taken by me leading up to the commitment letters coming in during the months of July and August prove that the tasks I performed were successful. Each action I took was to see that the goal of opening Universal City was accomplished

In regards to question 27. b., a list of some of the contacts is attached. I have provided names and information throughout these answers and the same applies here. See answers to all questions above. I have provided files for certain vendors who we were using on this project. I talked to the Mayor and many City and County officials. I meet with Fred and his wife on many many occasions. I meet with bank officials at Compass and Colonial and Citi Bank as referenced above. I meet with many vendors of kitchen equipment. I meet and talked to representatives fro RED, Inc., Brady, Goodwin Brothers, East Bay and CEF. I meet with cable TV persons. I meet with representatives from Blue Cross Blue Shield of Alabama. I had gathered all of the information to make a decision on health care for employees. I meet with representatives of the Chamber of Commerce. I arranged for City Licenses including liquor licenses. I assisted Universal in every way to establish the corporation and become a registered business. I meet with attorneys for Fred Beasley. I did personal banking matters for Fred. I met with representatives from Paragon Printing. I meet with representatives Everett Marshall Construction. I meet with representatives TH Pruitt. I talked to and with representatives Olhausen and American Express. I meet with Web Designers, rental agencies, and computer persons. I talked to cash register companies. I talked to Bell South representatives. I meet with several interior designers and Architecture firms. I talked to Patriot Sings and assisted in designing the signs. I meet with or talked to hundreds of persons over the four months I was involved with this project. Each person or contact was a potential link in opening Universal City in Montgomery. Throughout these interrogatories, I have listed names and addresses of the important contacts.

21

In regards to question 27. c., I had approvals, commitments, lines of credit, loans, mortgages or other financing arrangements for over $3,100,000.00. I had established the business Universal. I had arranged for a location. I had arranged for the interior build outs, designs and construction. I had arranged for all of the utilities. I had arranged for the purchase of all kitchen equipment and the financing for the same. I had arranged for the purchase of all kitchen plates, dining ware, glasses and other similar equipment and the financing for the same. I had arranged for the purchase of all furniture and the financing for the same. I had arranged for the purchase of all games, machines and amusement equipment and the financing for the same. I had arranged for the purchase of all signs. I had arranged for capital to finance the opening and the early operation of Universal City. I had assembled the entire team necessary to accomplish each of the items set out in this answer.

I have produced hundreds of documents that respond to this question of what did I do during the fours months I was in Montgomery. I do not know how to answer in more detail everything I did to accomplish the opening of Universal City other than to say that everything was in order, the team had been selected, the financing was complete and ready to close, the designs and lay outs were complete. Everything was ready to move to final close and opening. I fully performed all tasks required of me leading up to my termination.

**QUESTION:**

28.   Identify the individual who purchased the office equipment and furnishings used at 2601 Vaughn Lakes, Apartment 1634 during the time Top Notch was performing services for Defendants. Identify who is in present possession of this equipment and furnishings. This equipment includes, but is not limited to, scanner/printer/copier combination, DVD player, assorted computer power cords, assorted desk top material. Identify by what authority the individual in possession of equipment and furnishings claims these equipment and furnishings.

**RESPONSE:**

28.   Almost every item in the apartment or at the business was purchased by me. All of the items purchased are the property of Universal and in the possession of Universal except the fax machine. The fax machine is still in my possession as Mr. Beasley has not picked up the same nor provided me with shipping information.

22

RESPECTFULLY SUBMITTED, this the 25th day of May, 2006.

William E. Brew

Mark N. Chambless (CHA013)

CHAMBLESS MATH ❖CARR, P.C.
Attorneys at Law
Post Office Box 230759
Montgomery, AL 36123-0759
Office (334) 272-2230

**State of California**
**County of** Alameda

SWORN TO AND SUBSCRIBED
before me on this 25th day of May, 2006.

Notary Public
My Commission expires: Dec. 26, 2009



CALISTA JACKSON
COMM. # 1633331
NOTARY PUBLIC - CALIFORNIA
STANISLAUS COUNTY
COMM. EXPIRES DEC. 26, 2009

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing instrument was served on all parties or attorneys of record as set forth below by hand delivery to the law office of counsel and depositing a copy thereof in the United States mail postage prepaid on this 26th th day of May, 2006.

OF COUNSEL

Jeffery W. Smith, Esq.
Post Office Box 1110
Montgomery, AL 36101-1110

23

# AFFIDAVIT OF ROB HERTENSTEIN

STATE OF _Alabama_                    )
COUNTY OF _Montgomery_            )

    Personally appeared before me, the undersigned Notary Public, in and for said County and State, Rob Hertenstein who, after being duly sworn, did depose and state on oath as follows:

    1.    My name is Rob Hertenstein. I am Senior Vice President and Commercial Lending Manager of Colonial Bank. In the Summer of 2005, I was Senior Vice President and Corporate Banking Manager at Compass Bank. I make this affidavit from my own personal knowledge of the facts related herein.

    2.    I have been provided the response of William Brew to an Interrogatory No. 11. In that response, Mr. Brew states that he negotiated a $100,000.00 "loan" and that it "was based upon his efforts" that this "loan" was made by Compass Bank.

    3.    In fact, Compass Bank established a $100,000.00 line of credit for Fred Beasley based upon his signature on the application. No "business plan" was required by the bank for the purpose of the $100,000 line of credit. Mr. Brew provided me what he termed a "business plan." This document was inadequate for any loan consideration and, in my judgment, provided no real information to a lender. Mr. Beasley's credit was sufficient for the line of credit established by Compass Bank.

    4.    Mr. Brew also states that he was told that a $900,000.00 loan "was approved" by Compass Bank. This is false. Compass Bank never committed on a loan of $900,000.00

on this project and such a loan was never approved. Mr. Brew could not have been told that any

loan had been approved in that amount.

     5.      I recall that Mr. Brew left Montgomery in late August or early September,

2005. Since that time, I have not talked to Mr. Brew or any attorney representing him. If I had

been asked by Mr. Brew or his attorney about what my testimony would be, I would have told

them what I have stated in this affidavit.

**Further affiant sayeth not.**

 

**ROB HERTENSTEIN**

STATE OF _Alabama_     )
COUNTY OF _Montgomery_  )

     I, the undersigned, a Notary Public in and for said State and County, hereby certify that

ROB HERTENSTEIN, whose name is signed to the foregoing Affidavit and who is known to

me, acknowledged before me on this day that, being informed of the contents of the

instrument, he executed the same voluntarily.

     Given under my hand and official seal on this the _30th_ day ~~of July,~~ _August_ 2006.

[SEAL]

NOTARY PUBLIC
My  Commission  Expires:

_8/00/07_

# AFFIDAVIT OF CHRIS SHIELDS

STATE OF _Colorado_ )

COUNTY OF _Denver_ )

Personally appeared before me, the undersigned Notary Public, in and for said County and State, Chris Shields who, after being duly sworn, did depose and state on oath as follows:

1.      My name is Chris Shields. I am Business Development Manager with Creative Equipment Funding, LLC. I am familiar with the facts related in this affidavit.

2.      I have been provided a copy of the response to Interrogatory No. 13 and a letter from me to William Brew concerning William Brew's dealings with CEF. In that response, Mr. Brew states that he "negotiated a $1,500,000.00 line of credit on a lease purchase arrangement." He says that "this was approved on August 22, 2005." Finally, he says that a letter from me stated that this had been approved.

3.      This is false. I had never dealt with Mr. Brew before I was approached through Goodwin Brothers, Inc., a vendor in Montgomery with which my company does business. There was no guaranteed loan commitment for this project. The only conversations I had with Mr. Brew involved negotiations and tentative offers.

4.      I have not heard from Mr. Brew or any attorney representing Mr. Brew since he was terminated by Mr. Beasley. If either Mr. Brew or his attorney had asked, I would have explained to them that CEF never approved any line of credit.

**Further affiant sayeth not.**

**CHRIS SHIELDS**

STATE OF _Colorado_ )
COUNTY OF _Denver_ )

    I, the undersigned, a Notary Public in and for said State and County, hereby certify

that CHRIS SHIELDS, whose name is signed to the foregoing Affidavit and who is known

to me, acknowledged before me on this day that, being informed of the contents of the

instrument, he executed the same voluntarily.

    Given under my hand and official seal on this the _14_ day of July, 2006.

[SEAL]

NOTARY PUBLIC
My Commission Expires: _12/15/2008_

JENNIFER M. WALLACE
NOTARY PUBLIC
STATE OF COLORADO

-2-

# AFFIDAVIT OF JAMES G. SMILEY, III.

STATE OF _North Carolina_          )
COUNTY OF _Mecklenburg_          )

Personally appeared before me, the undersigned Notary Public, in and for said County and State, James G. Smiley, III. who, after being duly sworn, did depose and state on oath as follows:

1.     My name is James G. Smiley, III. I am Vice President, Credit and Finance, Brady Distributing Company. I make this affidavit from my own personal knowledge and from my review of records maintained by Brady Distributing Company pertaining to its dealings with Universal City, LLC.

2.     I have reviewed what is described to me as the response of William Brew to "Interrogatory No. 14" which purports to relate an approval of a line of credit in the amount of $600,000.00 by Brady Distributing Company. Mr. Brew references a letter from me delivered August 31 by facsimile.

3.     That letter was sent to Mr. Brew after repeated requests by him. I understand now that he had been terminated by Fred Beasley the day before he asked me to fax the letter. The letter is not a guaranteed loan commitment. It states that the "approval is subject to the final bank underwriting requirements." In other words, Brady was not going to make a loan. Brady was going to take the application submitted by Universal City to its bank and let the bank make that decision. Any loan would have required the approval of Brady's bank, the personal guarantees of Mr. and Mrs. Beasley and a down payment of $120,000.00. To refer

to my letter of August 31 as a "final approval letter" mischaracterizes my letter.

4.      I have not been contacted by Mr. Brew in almost a year.  I have never been contacted by Mr. Brew's lawyer.  If I had, I would have told either of them the facts as reflected in this affidavit and would have explained that Brady Distributing Company never approved a line of credit in the amount of $600,000.00.

**Further affiant sayeth not.**


*James G. Smiley, III*
**JAMES G. SMILEY, III.**


**STATE OF** North Carolina )
**COUNTY OF** Mecklenburg )

I, the undersigned, a Notary Public in and for said State and County, hereby certify that JAMES G. SMILEY, III., whose name is signed to the foregoing Affidavit and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same voluntarily.

Given under my hand and official seal on this the 14th day of July, 2006.

[SEAL]

Shana Chaulins
NOTARY PUBLIC
My Commission Expires: 9-29-08