## UNITED STATES DISTRICT COURT for the
## MIDDLE DISTRICT of ALABAMA

| | |
|---|---|
| TOP NOTCH CONSULTING, INC. | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. <u>2:05-cv-996-MHT</u> |
| | ) |
| UNIVERSAL CITY, LLC.; and | ) |
| FREDERICK J. BEASLEY, III | ) |
| | ) |
|     Defendants. | ) |

### PLAINTIFF'S REPLY TO DEFENDANTS
### MOTION FOR SUMMARY JUDGMENT

Comes Now the Plaintiff by and through counsel of record and hereby responds to the Defendants Motion for Summary Judgment and states that the same is due to be denied as to all Counts set out in the complaint and as cause would show as follows:

In support of the reply set forth below the Plaintiff offers the following documents in:

1. The complaint;
2. The contract signed by the parties marked as Exhibit A;
3. Amended contract dated August 2, 2005 and marked Exhibit B;
4. The Affidavit of William E. Brew;
5. Exhibit 0134;
6. Exhibit 0137;
7. Exhibit 0138;
8. Exhibit 0139;
9. Exhibit 0140;
10. Exhibit 0317-0318;
11. Exhibit 0314-0316;
12. The Affidavit of Fred Beasley;
13. The Affidavit of Chris Shields;
14. The Affidavit of James G. Smiley, III;
15. The Affidavit of Rob Hertenstein;
16. Notice of termination dated August 30, 2005 and original enveloped post marked October 7, 2005, marked Exhibit E;
17. August 30, 2005 email from Fred Beasley, marked Exhibit F;
18. September 13, 2005 email from Fred Beasley marked Exhibit G;
19. Secretary of States Corporate records concerning the formation of Beasley

1

Development Company, LLC, marked Exhibit C;

20. Secretary of States Corporate records concerning the formation of Universal City, LLC., marked Exhibit D; and

21. A brief in support of Plaintiff's response;

Wherefore, the above premises considered, the Plaintiff asserts that the Defendant's Motion for Summary Judgement is due to be denied.

**RESPECTFULLY SUBMITTED**, this the 7th day of December, 2006.

Mark N. Chambless (CHA013)

CHAMBLESS, MATH ❖Carr, P.C.
Attorneys at Law
Post Office Box 230759
Montgomery, AL 36123-0759
Office (334) 272-2230

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was served on all parties or attorneys of record as set forth below by depositing a copy thereof in the United States mail postage prepaid and by e-mail on this 7th day of December, 2006.

OF COUNSEL

Jeffery W. Smith, Esq.
Post Office Box 1110
Montgomery, AL 36101-1110

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

TOP NOTCH CONSULTING, INC.,         *
         *
         Plaintiff,         *
         *
         *   CASE NO. 02:05-cv-996-MHT
UNIVERSAL CITY, LLC.; and         *
FREDERICK J. BEASLEY, III,         *
         *
         Defendants.         *

## INDEX OF EXHIBITS

1.  The complaint;
2.  The contract signed by the parties marked as Exhibit A;
3.  Amended contract dated August 2, 2005 and marked Exhibit B;
4.  The Affidavit of William E. Brew;
5.  Exhibit 0134;
6.  Exhibit 0137;
7.  Exhibit 0138;
8.  Exhibit 0139;
9.  Exhibit 0140;
10. Exhibit 0298;
11. Exhibit 0314-0316;
12. The Affidavit of Fred Beasley;
13. The Affidavit of Chris Shields;
14. The Affidavit of James G. Smiley, III;
15. The Affidavit of Rob Hertenstein;
16. Notice of termination dated August 30, 2005 and original enveloped post marked
    October 7, 2005, marked Exhibit E;
17. August 30, 2005 email from Fred Beasley, marked Exhibit F;
18. September 13, 2005 email from Fred Beasley marked Exhibit G;
19. Secretary of States Corporate records concerning the formation of Beasley
    Development Company, LLC, marked Exhibit C;
20. Secretary of States Corporate records concerning the formation of Universal City,
    LLC., marked Exhibit D;
21. A brief in support of Plaintiff's response.

**UNITED STATES DISTRICT COURT for the**
**MIDDLE DISTRICT of ALABAMA**

| | |
|---|---|
| **TOP NOTCH CONSULTING, INC.** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CASE NO.** _____2005-_____ |
| | ) |
| **UNIVERSAL CITY, LLC.; and** | ) |
| **FREDERICK J. BEASLEY, III** | ) |
| | ) |
| **Defendants.** | ) |

**COMPLAINT**
**JURISDICTION and STATEMENT OF THE PARTIES**

1.    Plaintiff, TOP NOTCH CONSULTING, INC. (herein referred to as "TOP NOTCH"),

is a California corporation with its principal place of business in Oakland, CA 94612.

2.    Defendant, UNIVERSAL CITY, LLC. (herein referred to as "UNIVERSAL "), is a

registered Alabama Limited Liability Company doing business in Montgomery County Alabama.

3.    Defendant, FREDERICK J. BEASLEY, III, who is also known as Fred Beasley and

Frederick J. Beasley, is an individual over the age of nineteen and a resident of the state of Alabama.

4.    This action is filed in this Court based upon and pursuant to the provisions of the

*28 U.S.C.A. § 1332.* This action is proper in the United States District Court as the parties are citizens

of different states and the amount in controversy exceeds $75,000.00 as well as general legal and

equitable principles.

**STATEMENT OF THE FACTS**

5.    Top Notch is a California business that engages in the entertainment and restaurant

business.

6.    Top Notch and its owner William Brew created a business idea, plan and concept and

EXHIBIT

1

established a combination entertainment and restaurant business in California that was frequented by many professional athletes including Frederick Beasley.

7.    Frederick Beasley enjoyed the business concept and discussed establishing a similar establishment in Montgomery Alabama with owner of Top Notch, William Brew.

8.    William Brew created a successful establishment and marketable concept of entertainment and restaurant through his time effort and personal investments.

9.    Frederick Beasley requested that William Brew travel to Montgomery Alabama and assist him in establishing a similar entertainment facility.

10.    To further this business venture, Frederick Beasley established an Alabama business under the name Universal City, LLC.

11.    Top Notch entered into a written contract for services with Universal on April 18, 2005, as the primary consultant to furnish labor, business knowledge, expertise and specifically those other services set out therein.

12.    Based upon the execution of the contract and the monetary guarantees set out therein, the owner of Top Notch, William Brew, temporarily relocated in Montgomery, Alabama to provide the services to Universal.

13.    The contract established compensation to be paid to Top Notch for the services to be provided under the contract.

14.    Immediately after the execution of the contract, the Plaintiff relocated to Montgomery and commenced the services required under the contract and to provide to Universal the services specifically described in the contract.

15.    Universal agreed to pay the monthly stipend of $5,000.00 beginning in May 2005.

16.    Universal agreed to pay a minimum amount of $25,000.00 to Top Notch for monthly consulting services and subsequently agreed to pay $5,000.00 per month ongoing until requested to terminate the contract.

17.    Universal agreed that, "upon closing the final loan a total percent of 10% will be split between mortgage fees and expenses and Top Notch".

18.    Universal agreed to, "treat all materials prepared by Top Notch as confidential and shall not disclose, copy, or share such materials without the written consent of Top Notch".

19.    Top Notch has not provided written permission pursuant to paragraph 3 of the agreement to Universal to further disclose, copy, or share such materials.

20.    Universal has used the written materials prepared by Top Notch and continues to use the work product of Top Notch despite the written agreement requiring written permission.

21.    Universal has not requested written permission from Top Notch to use the confidential materials or work products of Top Notch.

22.    Universal is continuing to pursue the project after the oral termination of Top Notch.

23.    Universal is continuing to use the same materials, concepts, ideas, business plan, vendors, suppliers, professionals, architects, loan companies, and other personnel organized by Top Notch for the project.

24.    Universal has continued its relationship with Compass Bank and to use the materials previously generated by Top Notch.

25.    Universal has continued its relationship with Citibank and to use the materials previously generated by Top Notch.

26.    Universal has continued its relationship with architect Don Stansell and to use the

3

materials previously generated by Top Notch.

27.    Universal has continued its relationship with the real estate company Aronov and to use the materials previously generated by Top Notch.

28.    Universal has continued its relationship with Ken Anderson, who is using the work product of Top Notch without written permission and to use the materials previously generated by Top Notch.

29.    Universal has continued its relationship with Brady Distributing Company and to use the materials previously generated by Top Notch.

30.    Universal has continued its relationship with Creative Equipment Funding, LLC and to use the materials previously generated by Top Notch.

31.    Universal has continued its relationship with Sandy Goodwin Brothers and to use the materials previously generated by Top Notch.

32.    UNIVERSAL has paid Top Notch  the total of sum of $20,000.00 of the contract amount and has refused to pay for the months of August, September, October and November.

33.    UNIVERSAL, through Frederick Beasley, informed Top Notch by telephone on August 30, 2005, that the contract was revoked and that Top Notch was terminated from additional service.

34.    The contract requires 30 days written notification of termination.

35.    Universal provided written notification of termination on or about October 8, 2005.

36.    Universal did not pay the $5,000.00 monthly fee due in August, September, October nor November.

37.    The termination notice was delivered by certified mail to Top Notch at its place of

4

business in California.

38.    Top Notch fully performed the services required by the original contract up to and including September 2, 2005.

39.    Universal has provided no reason or other justification for its refusal to pay the monthly management fee.

40.    Top Notch assisted Universal in obtaining a loan from Compass Bank in the amount of $100,000.00.

41.    Universal was paid and received $100,000.00 from Compass Bank.

42.    This loan was a closed loan and remains due and payable to Compass Bank.

43.    Top Notch was entitled to a fee of $10,000.00 upon the closing and Universal has refused to pay the fee due under the contract.

44.    Top Notch established a business relationship for Universal with Citibank.

45.    Citibank approved a transaction whereby Universal would receive up to $831,000.00.

46.    Top Notch was entitled to a fee of $83,100.00 upon the closing and Universal has refused to pay the fee due under the contract.

47.    Top Notch established a business relationship for Universal with Creative Equipment Funding, LLC.

48.    Creative Equipment Leasing, LLC., approved a $1,500,000.00 equipment leasing line of credit for Universal.

49.    Top Notch was entitled to a fee of $150,000.00 upon the closing and Universal has refused to pay the fee due under the contract.

50.    Top Notch established a business relationship for Universal with Brady Distributing

5

Company.

51.    Brady Distributing Company approved a $600,000.00 equipment leasing and purchasing line of credit for Universal.

52.    Top Notch was entitled to a fee of $60,000.00 upon the closing and Universal has refused to pay the fee due under the contract.

53.    Universal  has refused to pay the 10% commission due under the contract to Top Notch.

54.    Universal is using the business materials, concepts and ideas generated by Top Notch without written permission.

## COUNT I
## BREACH OF CONTRACT

55.    Top Notch  asserts as if fully set forth herein paragraphs 1 through 54 above.

56.    The parties entered into a contract that established detailed and specific duties of the parties.

57.    Top Notch  has fully performed the services as set out and required by the original contract.

58.    In addition to the duties required in the original contract, Top Notch  has performed numerous additional services as directed by and required by representatives and officers of UNIVERSAL .

59.    UNIVERSAL  has failed and refused to perform as required by the contract and

6

Alabama law in that UNIVERSAL has failed to pay the contract amount over to Top Notch for the services performed or to provide written reasons as to what services have not been provided and establish a value for each of the unperformed services and pay over the undisputed balance.

60.     UNIVERSAL has failed to pay over to the Plaintiff the undisputed portions of the final pay request or provided detailed explanation as to what services have not been performed as required by Alabama law.

61.     UNIVERSAL has breached the contract.

62.     Top Notch has been damaged as a direct and proximate result of the breach by UNIVERSAL.

63.     Top Notch is due the sum of $20,000.00 on the original contract for monthly payments and an amount exceeding $303,100.00, interest in the amount to be determined by the jury, attorney fees plus the costs of this case.

64.     Top Notch is entitled to interest, costs of this action, attorney fees and such other relief as this court deems appropriate.

WHEREFORE, Plaintiff demands judgment against the Defendants, UNIVERSAL CITY, LLC. and Frederick Beasley in the amount of $350,000.00 for breach of contract for the original contract, the sum of $20,000.00 as damages for the breach concerning monthly payments, the sum of $100,000.00 in loss profits for breach of the contract, interest at a rate of 6% per annum from September 1, 2005, plus attorneys fees and costs of this action.

### COUNT II
### BREACH OF CONTRACT
### and INTERFERENCE WITH BUSINESS RELATIONS

65.     The Plaintiff, Top Notch., hereby incorporates and adopts the information

7

found in the preceding paragraphs 1 through 64 as if fully set out and re-averred herein.

66.     The contract entered into by the parties protected the work product of the Plaintiff from any unauthorized use, distribution or other taking by Defendant.

67.     The Defendant has continued to use the work products of the Plaintiff and has or may have attempted to do one or all of the following: (1) called on various customers of Top Notch;  (2) provide misleading, false and inaccurate information to the current customers of Top Notch., in an effort to convert them to continue the business relationship established by Top Notch; (3) provided misleading, false and inaccurate information to the others about Top Notch; (4) possessed  various documents and other property that lawfully belongs to Plaintiff; and/or (5) worked and done acts to damage and destroy the business and reputation of Top Notch.  Said conduct constitutes tortuous interference with business relations.

68.     Defendants have full knowledge of the contract provision protecting the work product of Top Notch.

69.     Said conduct and activity as described above, by Mr. Frederick Beasley and by Universal, has been performed without justification and has been done with the specific intent to damage and interfere with the business of Top Notch

70.     All of the conduct described above has been designed to interfere with the business and reputation of Top Notch and constitutes a breach of the contract.

71.     As a proximate result of the conduct described above, Top Notch., has been damaged and has suffered loss.  Specifically, as a result of said conduct Top Notch has potentially lost intellectual property, customer and vendor lists, price lists, procedure manuals, and other intellectual

property rights, customers and business, has had its intellectual property and trade secrets disseminated, has been deprived of its property and in various other ways has been damaged.

WHEREFORE ALL PREMISES CONSIDERED, the Plaintiff, Top Notch, hereby DEMANDS judgment against the Defendants, Mr Frederick Beasley and Universal, for any and all compensatory damages necessary to make it whole. Plaintiff further demands interest, attorneys fees, and the costs of this action, as well as punitive damages to punish the entities named for their intentional misconduct. Top Notch, also pleads for any and all other relief which it may be justifiably entitled to under the law.

## COUNT III
## VIOLATION OF ALABAMA'S TRADE SECRETS ACT

72.    The Plaintiff, Top Notch, hereby incorporates and adopts the information found in the preceding paragraphs 1 through 71 as if fully set out and re-averred herein.

73.    The Plaintiff has not provided to the defendants permission to use any of its work products.

74.    The Defendant has not requested written permission to use the work products of the Plaintiff.

75.    Both Frederick Beasley and Universal have disseminated the intellectual property and trade secrets of Top Notch.

76.    The Defendants have disclosed and/or used the trade secrets of Top Notch, without privilege to do so, and is thus liable to Top Notch, for misappropriation of its trade secrets.

77.    The conduct and actions of Defendants have been and are in direct violation of Ala. Code, § 8-27-3 (1975), et.seq.

9

78.   As a result of the described conduct, the Plaintiff, Top Notch., has been damaged and has suffered loss.  Specifically, as a result of the Defendant's conduct and breach, Top Notch. , has lost customers and business, has had its intellectual property and trade secrets disseminated, has been deprived of its property and in various other ways has been damaged.

WHEREFORE ALL PREMISES CONSIDERED, the Plaintiff hereby DEMANDS judgment against the Defendants, for any and all damages appropriate, pursuant to the foregoing:

A.   Such injunctive and other equitable relief as may be appropriate;

B.   Recovery of any profits and other benefits conferred by the misappropriation that are attributable to the misappropriation

C.   The actual damages suffered as a result of the misappropriation;

D.   Reasonable attorney's fees;

E.   Exemplary damages; and

F.   Any and all other relief, to which it may be entitled under the law.

## COUNT IV
## QUANTUM MERUIT

79.   The Plaintiff, Top Notch, hereby incorporates and adopts the information found in the preceding paragraphs 1 through 78 as if fully set out and re-averred herein.

80.   Plaintiff performed certain services that benefitted the Defendants and is entitled to be compensated quantum meruit.

81.   Each service rendered was performed at the direction of UNIVERSAL  and was required to be performed by Top Notch per the written contract .

82.   Each service performed was necessary to be completed in order for the work

10

required by the original contract to be completed or was an additional service requested by

UNIVERSAL to be performed.

83.    Each additional service performed was necessitated by the demands of UNIVERSAL.

WHEREFORE, Plaintiff demands judgment against the Defendants, Frederick Beasely

and UNIVERSAL, for sums due under the original contract for all work performed and materials

provided and for the extra services performed by Top Notch for the benefit of Defendants in an

amount exceeding Four Hundred Thousand dollars ($400,000.00).

**RESPECTFULLY SUBMITTED**, this the 17th day of October, 2005.


_____
Mark N. Chambless (CHA013)


CHAMBLESS ❖MATH, P.C.
Attorneys at Law
Post Office Box 230759
Montgomery, AL 36123-0759
Office (334) 272-2230
Facsimile (334) 272-1955

11



# MANAGEMENT AGREEMENT

This Management Agreement (the "Agreement") is entered into this the __28th__ day of April 2005 by and between Universal City LLC, an Alabama Limited Liability Corporation (Universal) and Top Notch Consulting, Inc. (Top Notch), a California Corporation.

## BACKGROUND

Universal City, LLC. is endeavoring to create a full service entertainment and real estate development company designed to serve as a viable bridge from the NFL to the "World of Business". Universal will explore business opportunities in the areas of Entertainment, Office, Retail and Housing Development.

## RECITALS

WHEREAS, Universal is anticipating its needs into the next century by pursuing opportunities in the real estate development industry and entertainment industry; and

WHEREAS, Top Notch by reason of its experience, background, and professional contacts, is qualified and willing to render such services to Universal; and

WHEREAS, Universal desires to retain Top Notch to provide services pursuant to the terms and conditions hereinafter set forth in this Agreement;

NOW, THEREFORE, in consideration of the efforts expended and to be expended by them, and in consideration of the mutual covenants and conditions contained herein, the parties hereto agree as follows:

## AGREEMENT

1. Agreement to Provide Services: Top Notch agrees to provide Universal the services outlined in Section 2 hereof, subject to and in accordance with the provisions of this Agreement.

2. Scope of Services: Top Notch shall provide the following services in connection with the development and financing of the Universal City Project (the Project):

   a. Prepare a complete business plan for the Project.

   b. Secure funding for the Project in a loan amount required by Universal.

   c. Prepare a budget for the Project, and determine the ongoing feasibility of the Project.

   d. Arrange, assist and advise with Project financing and construction.

**EXHIBIT**

2

e. Package documents, interview, and advise on the selection of lending institution(s);

f. Complete grant and loan applications and other applications for any other sources of financing or subsidy;

g. Negotiate on behalf of Universal with respect to contractual agreements and construction issues that arise during the preconstruction period;

h. Create project design and interior layouts for the permit process, and work with the city and county to assist with securing all government agency permits and licensing for the project;

I. Act as liaison between general contractor and Universal;

j. Coordinate any pre-construction meetings;

k. Review and bid documentation and make recommendations;

l. Advise on administrative, organizational, and management systems;

m. Participate in meeting with Universal clients, political officials, and others as deemed necessary and appropriate;

n. Produce a weekly Project Summary;

o. Complete the business plan.

P. Open and manage the project until Universal has obtained permanent management.

3. Agreement to Engage: In consideration of this Agreement, Universal agrees that they shall treat all materials prepared by Top Notch as confidential and shall not disclose, copy, or share such materials without written consent of Top Notch.

4. Compensation: In consideration for the services enumerated above, Universal shall pay to Top Notch a management fee of $5000.00 per month beginning in May, 2005 and each month thereafter until $25,000.00 is paid, plus reasonable expenses to include lodging, food, and transportation to be approved by Universal.

Upon closing the final loan a total percent of 10% will be split between mortgagee fees and expenses and Top Notch. All mortgagee expenses will be paid first and the balance of the 10% will be paid to Top Notch.

5. Term: The term of this Agreement shall be from the date hereof through the Grand Opening of the subject venue and continue with management until Universal has permanent management. Notwithstanding the foregoing, Universal may terminate this Agreement by providing Top Notch thirty (30) days written notice.

6.  Accounting and Right of Inspection: Top Notch will maintain accurate books and records of all transactions concerning Universal.  All said records solely relating to Universal may be inspected by Universal or a designated certified public accountant, during regular business hours, at Universal's sole expense.  Universal shall provide Top Notch with written notification at least seven (7) days prior to the desired date of said inspection.

7.  Use of Other Consultants: Universal acknowledges that Top Notch is not providing legal, engineering, architectural, or professional accounting services.  To the extent that Top Notch or Universal believe that such professional services may be required, Top Notch will work with Universal to identify and negotiate costs and Statements of Work with appropriate individuals to provide such professional services.

8.  Assignment of Agreement: No assignment of the rights or benefits and no delegation of duties provided in this Agreement may be made without the written consent of the non-assigning or non-delegating party; provided, however, that Top Notch may subcontract certain or all of the services to be performed under this Agreement.  In such case, Top Notch shall still retain primary liability for their performance under this Agreement.

9.  Non-Compete Disclosure: Top Notch agrees not to compete with Universal with respect to any Universal venture covered by this Agreement in the local market of such venture.

10.  Cancellation: If for any reason Universal decides not to proceed with recommended development plans, Universal agrees to reimburse Top Notch for all expenses incurred in the development of the plans, applications, and other development related experiences.

11.  Saving Clause: If one or more provisions of this Agreement or any application of any provision shall be deemed or declared invalid, illegal, or unenforceable in any respect, the validity, legality, or enforceability of the remaining provisions of this Agreement shall in no way be affected or impaired.  The laws of the State of Alabama shall govern this Agreement.  Any action to enforce, arising out of, or relating in any way to, any of the provisions of this Agreement shall be brought and prosecuted only in such court or courts located in the State of Alabama as is provided by law; and the parties consent to the jurisdiction of said court or courts located in the State of Alabama.

12.  Modification: This Agreement shall not be changed, modified, or amended except in writing and signed by all parties.

13.  Status of Parties:  The relationship created by the Agreement shall be, at all times and in all circumstances one of contractor/independent contractor and shall not be one of employer/employee.  This Agreement shall not create a joint venture or partnership among the parties for any intents, purposes, and designs or in any activities or properties.

14.  No Continuing Waiver: The waiver of any party of a breach of any provision of this Agreement shall not operate or be construed to be a waiver of any subsequent breach.  No waiver shall be effective unless in writing and signed by the party against whom it is sought to be

enforced. A breach by one party of its duties to another party shall not, of itself, be deemed a breach by any other party of its obligations under this Agreement.

15. <u>Binding Nature:</u> This Agreement shall bind and inure to the benefit and burden of the parties, their personal representatives, successors and assigns.

16. <u>Integration:</u> This Agreement constitutes the entire agreement between the parties pertaining to the subject matter of this Agreement and supercedes all of the contemporaneous agreements or understandings of the parties in connection with this subject matter.

The parties hereto have executed this Agreement as of the date first set forth above.

Top Notch Consulting, Inc.                    Universal City, LLC

By: _____               By: _____
William Brew, Its President                   Fred Beasley, Its Manager

STATE OF _____
COUNTY OF _____

      I, the undersigned authority, a Notary Public for the State of _____, do hereby certify that **William Brew**, whose name is signed above, did personally appear before me this day and, being informed of the contents of the conveyance, did sign the same voluntarily.

      Given under my hand and seal this the _____ day of _____, 2005.

_____
Notary Public

My Commission Expires:_____

STATE OF CALIFORNIA )
COUNTY OF ALAMEDA   )

On May 5, 2005 before me, the undersigned, a Notary Public
in and for said State, personally appeared William Brew,
personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person whose name(s) is/are
subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the
instrument, the person, or the entity upon behalf of which the
person acted, executed the instrument.

WITNESS my hand and official seal.

*Carol A. Harpster*
NOTARY PUBLIC

CAROL A. HARPSTER
COMM. #1539682
NOTARY PUBLIC-CALIFORNIA
COUNTY OF ALAMEDA
My Comm. Exp. Dec. 30, 2008

## CONTRACT AMENDMENT

Paragraph four (4), page two (2) of said contract by and between Universal City, LLC and Top Notch Consulting, Inc. dated April 18, 2005 is hereby amended as follows:

Delete entire paragraph four(4) and in its stead place the following:

4. **Compensation**: In consideration for the services enumerated above, Universal shall pay to Top notch a management fee of $5000.00 per month beginning in May, 2005 and on the first of each month thereafter until the business is open for business, plus reasonable expenses to include lodging, food, insurance, and transportation to be approved by Universal. In addition, Top Notch is to be paid $850.00 per week to manage the facility after opening until a permanent manager can be obtained. Upon closing any financing, a total percent of 10% will be split between mortgage fees and expenses and Top Notch. All mortgagee expenses will be paid first and the balance of the 10% will be paid to Top Notch. Payment of the percentage loan fees will be made after closing final loan for said project.

The parties hereto have executed this Amendment as of August _2_, 2005.

Top Notch Consulting, Inc.                    Universal City, LLC.

By: _William Brew, President_                 By: _____
William Brew, Its President                   Fred Beasley, Its Manager

### Acknowledgment

STATE OF _____
COUNTY OF _____

I, the undersigned authority, a Notary Public for the State of _____, do hereby certify that **Top Notch Consulting, Inc. Executed by William Brew**, whose name is signed above; did personally appear before me this day and, being informed of the contents of the conveyance, did sign the same voluntarily.

Given under my hand and seal this the _____ day of _____, 2005.

_____
Notary Public

My Commission Expires: _____

**EXHIBIT**
_B_

**EXHIBIT**
3

Dec 06 2006 6:16PM    TOP NOTCH CONSULTING    5103963365    P. . .

## UNITED STATES DISTRICT COURT for the
## MIDDLE DISTRICT of ALABAMA

TOP NOTCH CONSULTING, INC.    )

    Plaintiff,    )
    )
    )
v.    )  CASE NO.  2:05-cv-996-MHT
    )
UNIVERSAL CITY, LLC.; and    )
FREDERICK J. BEASLEY, III    )
    )
    Defendants.    )

### AFFIDAVIT OF WILLIAM E. BREW

STATE OF CALIFORNIA    )
COUNTY OF  ALAMEDA     )

    Personally appeared before me, the undersigned Notary Public, in and for said County and State, William E. Brew who, after being duly sworn, did depose and state under oath as follows:

1.  My name is William E. Brew. I am the sole owner of all of the stock of Top Notch Consulting, Inc. I am also the sole shareholder, director and officer.

2.  Top Notch is the Plaintiff in the above styled matter. As the sole shareholder, director and officer I authorized the filing of the suit against the Defendants listed above.

3.  I created a unique business in my home state of California. This business was called Brews Sports Bar. The Defendant, Fred Beasley, was a regular customer at my business. This is where I meet the Defendant.

4.  This business was unique in that I combined several business concepts and created a family restaurant, entertainment center and games facility. During family hours, my facility catered to families and then after family hours, the sports bar was opened for adults. There was no other facility in my home town that utilized this business concept.

5.  The business was successful and Mr. Beasley liked the business concept and questioned me about opening a similar facility in his home town of Montgomery, Alabama.

6.  I am not a resident of Alabama and did not intend to become a business owner in Montgomery Alabama nor conduct business outside my home state.

7.  Mr. Beasley requested that assist him in opening a facility in Montgomery Alabama.

8.  I informed Mr. Beasley about the approximate costs of opening a facility similar to mine would be between $2,500,000.00 and $3,000,000.00.



EXHIBIT
4

9.   Mr. Beasley informed me that he had the financial ability to open such a facility. At no time did Mr. Beasley inform me that financing the business would questionable of difficult but he informed me exactly the opposite. In fact, Mr. Beasley requested that I simply "secure funding". At no time did Mr. Beasley inform me that I would have to seek out financing or seek out real estate mortgages loans to finance the project.

10.   Mr. Beasley offered to pay me 10% of the anticipated costs of opening the business if I would come to Montgomery and set up the business.

11.   This 10% fee was to be paid at the final closing. Top Notch was to be paid $5,000.00 per month during the start up period until $25,000.00 was paid. (See Exhibit 1, paragraph 4).

12.   This contract was agreed to and signed in April 2005.

13.   The anticipated length of time required to open the facility was expected to be four to five months.

14.   I moved to Montgomery Alabama and left my family in California, expecting to be in Montgomery approximately five (5) months.

15.   I substantially performed every duty required by the contract.

16.   The financing was arranged.

17.   Citibank approved loans which would result in $831,000.00 cash back to fund this project.

18.   Brandy approved a loan of $600,000.00 subject to several nominal conditions to be meet by Fred Beasley.

19.   CEF, Inc. approved a lease purchase arrangement which would have resulted in financing $1,500,000.00 worth of equipment with nominal conditions to be meet by Fred Beasley.

20.   Mr. Beasley refused to cooperate or act in good faith in the financing beginning in August.

21.   I had arranged financing though several vendors and from several sources as it became apparent in July that Mr. Beasley did not have the ability of simply "secure funding" as he stated.

22.   Mr. Beasley knew that when the financing was finalized, Top Notch would be entitled to 10 % of the costs or approximately $250,000.00.

23.   In July and early August, it became clear that Mr. Beasley was not cooperating in obtaining the financing to fund the project. By the beginning of August, I had substantially completed all duties under the contract and Top Notch had performed under the contract.

24.   The securing of financing was completely dependent upon the good faith efforts and fair dealings of the defendants.

25.   As the defendants refused to cooperate during the month of August 2005, financing could not be arranged nor completed nor closed.

26.   On August 30, 2005 after receiving several letters offering credit for the project in the amounts exceeding $2,000,000.00, Fred Beasley terminated the contract.

27.   The actions of Mr. Beasley terminating Top Notch were done in bad faith with the clear intent to prevent the payment of the commission.

28.   The claims of Mr. Beasley that I was not performing are a subterfuge and evasion

ec 06 2006 6:16PM    TOP NOTCH CONSULTING    5103363330

of good faith and fair dealing.

29. The project is ongoing and radio advertisements claim the project is to be opened under the name "Freddie B's".

30. All of the work product Top Notch created is still in use and being used on the project. No work has been returned to me. All information and work product of Top Notch was protected by contract.

31. The contract specifically protects the information and the same is being used by the defendants on this project without my written permission.

32. Top Notch is entitled to its commissions of 10% due to the willful failure of Defendants to close on financing.

33. The contract was entered into by and between Top Notch Consulting, Inc. and Universal City, LLC.

34. Fred Beasley on behalf of Universal City, LLC terminated the contract with Top Notch and has continued the project under the name Freddie B's or some other similar name using the business plan and vendors.

35. The actions of Fred Beasley were done in a calculated manner so as to refuse to pay Top Notch commissions and to interfere with the existing contract.

36. Top Notch has lost over $250,000.00 in commissions by Fred Beasley refusing to assist in obtaining the financing and by otherwise interfering with the contract.

37. Fred Beasley has used the business plan and information obtained through the work of Top Notch to continue this project.

38. Mr. Beasley states in his affidavit that the project is continuing and he plans to open the business using the same concepts and business plan developed by Top Notch.

39. The contract protected the information developed by Top Notch.

**Further affiant sayeth not.**

**RESPECTFULLY SUBMITTED,** this the 6th day of December, 2006.

William B. Brew

SWORN TO AND SUBSCRIBED this ___6___ day of December, 2006.

Notary Public

My Commission expires: Apr 1 2009

WALTER C. MURRAY
Commission # 1889222
Notary Public - California
Alameda County
My Comm. Expires Apr 1, 2009

510 832 7100    WCMINSURANCE.CM    DEC-06-2006 05:52 PM    P.03



Citibank (West), FSB
Lafayette
3614 Mt. Diablo Blvd.
Lafayette, CA 94549

Proposal for Fred Beasley

Primary Property
Value  $700,000; Loan Amt. $525,000, Payment $3,493.67 (N/I prop. taxes and insurance) Cash back $310,000

Secondary Property
Value $550,000; Loan Amt. $440,000, Payment $2,745.03 (N/I prop. taxes and insurance)  Cash back $220,000

Rental 1 (1134 S. College)
Value $300,000; Loan Amt. $210,000, Payment $1,327.34 (N/I prop.taxes and insurance) Cash back $130,000

Rental 2 (730 W Magnolia)
Value $400,000; Loan Amt. $280,000, Payment $1,769.79 (N/I prop. Taxes and insurance) Cash Back $171,000

Total Cash Back  $831,000

We estimate a 2 week turnaround on all properties.  Please call me if you have any questions at 510-385-7781...

Thank You,

Joe Bohannon
Citibank Retail Lending

0134

EXHIBIT

A member of

5



**Citibank (West), FSB**
**Layfayette**
3614 Mt. Diablo Blvd.
Lafayette, CA 94549

June 16, 2005

Re: Approval

Dear Mr. And Mrs. Fred Beasley

Congratulations!  Your mortgage application is approved based on the information you provided and the loan details outlined in the section below.

LOAN DETAILS:

| | |
|---|---|
| Property Address: | 48 Payne Rd |
| Mortgage Amount: | $440,000.00 |
| Sales Price/Estimated Value: | $550,000.00 |
| Mortgage Product: | 30 Year Fixed |
| Interest Rate:* | 6.375% |
| Margin: | N/A |
| Term: | 360 months |
| Loan Origination and discount fees not to exceed 0% of the loan amount | |
| Rate commitment option: | 90 Day Floating Rate |

All we need to close your loan is an acceptable appraisal supporting the property value, type and condition, acceptable title review, and, just prior to closing, assurance that all customary closing conditions have been met.  Your financial situation must also remain as strong as it is today.  If applicable, Condominium, Co-op or Planned Unit Development documentation is required to confirm that your property meets our current eligibility guidelines.  In some cases, mortgage insurance may be required on your loan.  We will apply to the mortgage insurer on your behalf and advise you if they approve your application.

When the above conditions are met you will receive a Commitment Letter outlining what is necessary to close your loan.

Thank you for choosing us and providing us the opportunity to serve you.  If you have any questions, please call me at 510 385-7781.

Sincerely,

Joe Bohannon
Lending Consultant
CitiMortgage, Inc.

*If you have chosen a Floating Rate Option, your rate will change as the market interest rates fluctuate.  The interest rate shown above is the rate in effect only on the day of application.  If you have chosen a 60, 90, or 180 Day No Cap Floating Rate Option and your final rate would be more than 1% higher than the rate shown above, we reserve the right to reunderwrite your application and, if you do not qualify at the higher rate, withdraw this approval.  Please refer to the Rate Commitment Options form which will be mailed to you in the next few days for information on what you must do so that your final rate and points can be determined.  The provision of the Rate Commitment Options form is to be considered included in this approval.

**EXHIBIT**

6

A member of



**Citibank (West), FSB**
**Layfayette**
3614 Mt. Diablo Blvd.
Lafayette, CA 94549

June 16, 2005

Re: Approval

Dear Mr. And Mrs. Fred Beasley

Congratulations! Your mortgage application is approved based on the information you provided and the loan details outlined in the section below.

**LOAN DETAILS:**

| | |
|---|---|
| Property Address: | 730 W. Magnolia |
| Mortgage Amount: | $280,000.00 |
| Sales Price/Estimated Value: | $400,000.00 |
| Mortgage Product: | 30 Year Fixed |
| Interest Rate:* | 6.500% |
| Margin: | N/A |
| Term: | 360 months |
| Loan Origination and discount fees not to exceed 0% of the loan amount | |
| Rate commitment option: | 90 Day Floating Rate |

All we need to close your loan is an acceptable appraisal supporting the property value, type and condition, acceptable title review, and, just prior to closing, assurance that all customary closing conditions have been met. Your financial situation must also remain as strong as it is today. If applicable, Condominium, Co-op or Planned Unit Development documentation is required to confirm that your property meets our current eligibility guidelines. In some cases, mortgage insurance may be required on your loan. We will apply to the mortgage insurer on your behalf and advise you if they approve your application.

When the above conditions are met you will receive a Commitment Letter outlining what is necessary to close your loan.

Thank you for choosing us and providing us the opportunity to serve you. If you have any questions, please call me at 510 385-7781.

Sincerely,

Joe Bohannon
Lending Consultant
CitiMortgage, Inc.

*If you have chosen a Floating Rate Option, your rate will change as the market interest rates fluctuate. The interest rate shown above is the rate in effect only on the day of application. If you have chosen a 60, 90, or 180 Day No Cap Floating Rate Option and your final rate would be more than 1% higher than the rate shown above, we reserve the right to reunderwrite your application and, if you do not qualify at the higher rate, withdraw this approval. Please refer to the Rate Commitment Options form which will be mailed to you in the next few days for information on what you must do so that your final rate and points can be determined. The provision of the Rate Commitment Options form is to be considered included in this approval.

0138

A member of

**EXHIBIT**

7



**citibank®**

**Citibank (West), FSB**
**Layfayette**
3614 Mt. Diablo Blvd.
Lafayette, CA 94549

June 16, 2005

Re: Approval

Dear Mr. And Mrs. Fred Beasley

Congratulations! Your mortgage application is approved based on the information you provided and the loan details outlined in the section below.

LOAN DETAILS:

| | |
|---|---|
| Property Address: | 1134 S. College |
| Mortgage Amount: | $210,000.00 |
| Sales Price/Estimated Value: | $300,000.00 |
| Mortgage Product: | 30 Year Fixed |
| Interest Rate:* | 6.500% |
| Margin: | N/A |
| Term: | 360 months |
| Loan Origination and discount fees not to exceed 0% of the loan amount | |
| Rate commitment option: | 90 Day Floating Rate |

All we need to close your loan is an acceptable appraisal supporting the property value, type and condition, acceptable title review, and, just prior to closing, assurance that all customary closing conditions have been met. Your financial situation must also remain as strong as it is today. If applicable, Condominium, Co-op or Planned Unit Development documentation is required to confirm that your property meets our current eligibility guidelines. In some cases, mortgage insurance may be required on your loan. We will apply to the mortgage insurer on your behalf and advise you if they approve your application.

When the above conditions are met you will receive a Commitment Letter outlining what is necessary to close your loan.

Thank you for choosing us and providing us the opportunity to serve you. If you have any questions, please call me at 510 385-7781.

Sincerely,

Joe Bohannon
Lending Consultant
CitiMortgage, Inc.

*If you have chosen a Floating Rate Option, your rate will change as the market interest rates fluctuate. The interest rate shown above is the rate in effect only on the day of application. If you have chosen a 60, 90, or 180 Day No Cap Floating Rate Option and your final rate would be more than 1% higher than the rate shown above, we reserve the right to reunderwrite your application and, if you do not qualify at the higher rate, withdraw this approval. Please refer to the Rate Commitment Options form which will be mailed to you in the next few days for information on what you must do so that your final rate and points can be determined. The provision of the Rate Commitment Options form is to be considered included in this approval.

*0139*

A member of

**EXHIBIT**

8



**Citibank (West), FSB**
**Layfayette**
3614 Mt. Diablo Blvd.
Lafayette, CA 94549

June 16, 2005

Re: Approval

Dear Mr. And Mrs. Fred Beasley

Congratulations!  Your mortgage application is approved based on the information you provided and the loan details outlined in the section below.

**LOAN DETAILS:**

| | |
|---|---|
| Property Address: | 8130 Wyn Lakes Blvd. |
| Mortgage Amount: | $560,000.00 |
| Sales Price/Estimated Value: | $700,000.00 |
| Mortgage Product: | 30 Year Fixed |
| Interest Rate:* | 6.375% |
| Margin: | N/A |
| Term: | 360 months |

Loan Origination and discount fees not to exceed 0% of the loan amount
Rate commitment option:                90 Day Floating Rate

All we need to close your loan is an acceptable appraisal supporting the property value, type and condition, acceptable title review, and, just prior to closing, assurance that all customary closing conditions have been met.  Your financial situation must also remain as strong as it is today.  If applicable, Condominium, Co-op or Planned Unit Development documentation is required to confirm that your property meets our current eligibility guidelines.  In some cases, mortgage insurance may be required on your loan.  We will apply to the mortgage insurer on your behalf and advise you if they approve your application.

When the above conditions are met you will receive a Commitment Letter outlining what is necessary to close your loan.

Thank you for choosing us and providing us the opportunity to serve you.  If you have any questions, please call me at 510 385-7781.

Sincerely,

Joe Bohannon
Lending Consultant
CitiMortgage, Inc.

*If you have chosen a Floating Rate Option, your rate will change as the market interest rates fluctuate.  The interest rate shown above is the rate in effect only on the day of application.  If you have chosen a 60, 90, or 180 Day No Cap Floating Rate Option and your final rate would be more than 1% higher than the rate shown above, we reserve the right to reunderwrite your application and, if you do not qualify at the higher rate, withdraw this approval.  Please refer to the Rate Commitment Options form which will be mailed to you in the next few days for information on what you must do so that your final rate and points can be determined.  The provision of the Rate Commitment Options form is to be considered included in this approval.

0140

A member of

**EXHIBIT**

9



**Brady Distributing Company**

August 31, 2005

Mr. William Brew
Universal City
2601 Von Lakes Blvd., Suite 1634
Montgomery, AL 36117

Sent Via Fax: (334) 279-3210

Dear William:

Thank you for the opportunity to provide the amusement equipment you are purchasing for your project at Universal City. We are excited about working with you on the project and are very glad that you have chosen the products and service Brady Distributing Company offers as part of your plan. We are pleased to provide a financing commitment based on the terms and conditions outlined below. Please note that this letter is not intended to be all inclusive and other terms and conditions will be included in the final loan document. This approval is subject to the final bank underwriting requirements.

Proposed Terms and Conditions:

➢ <u>Borrower</u> – Universal City

➢ <u>Loan Amount</u> – Approximately $600,000.00 after down payment to fund equipment purchases.

➢ <u>Terms</u> - Down Payment equivalent to twenty (20%) of the gross invoice amount including sales tax, freight and delivery charges. The loan documents are executed and down payment is paid prior to delivery of equipment. Loan balance paid in term of your choice within the range of 12-36 months, including interest at Prime plus 3 points (currently 9.5% APR). Payments to begin 30 days after delivery of equipment and the rate will be fixed for the life of the loan.

➢ <u>Collateral</u> - Secured by first lien on equipment - UCC-1 and Security Agreement to be filed.

➢ <u>Other Loan Contingencies</u> – Personal guarantees of the principals involved will be required.

| 2708 Yorkmont Road | 3306 Winbrook Drive | 10024 Premier Parkway | 4225 |
| Charlotte, NC 28208 | Memphis, TN 38116 | Miramar, FL 33025 | Orla |
| 704/357-6284 | 901/345-7811 | 954/874-1100 | |
| Fax 704/357-1243 | Fax 901/398-0578 | Fax 954/874-1101 | Fax |

Visit our web site: www.

**EXHIBIT**

10

This commitment will be available for ninety days from this date.
If you have any questions, or if I may provide additional information, please do not
hesitate to call me in the Charlotte Office.


With Kindest Regards,

Brady Distributing Company

James G. Smiley III
Vice President, Finance & Credit

**Brady**
Brady Distributing Company



**Creative Equipment Funding, LLC**

1450 Poydras Street, Suite 1605
New Orleans, LA 70112
800.393.7023 Toll-Free
504.799.4180 Main
504.799.4189 Fax

VIA ELECTRONIC TRANSMITTAL

August 22, 2005

William Brew
Universal City, LLC
1661 Eastern
Montgomery, AL 36117
(334) 279-3210

Dear William:

Creative Equipment Funding, LLC ("CEF") is pleased to make this proposal to Universal City, LLC. The financing will be in the form of an equipment lease which will be subject to the following terms and conditions:

| | |
|---|---|
| **LESSEE:** | Universal City, LLC |
| **LESSOR:** | Creative Equipment Funding, LLC or its assigns |
| **EQUIPMENT:** | Various Restaurant Furniture, Fixtures and Equipment |
| **VENDOR:** | Goodwyn Brothers |
| **EQUIPMENT LOCATION:** | 1661 Eastern<br>Montgomery, AL 36117 |
| **DELIVERY AND ACCEPTANCE:** | Prior to November 30, 2006 |
| **LEASE LINE CREDIT FACILITY:** | $1,500,000.00. |
| **TRANSACTION TYPE:** | The lease will be a net transaction whereby maintenance, insurance, transportation, installation, taxes and items of a similar nature will be for Lessee's account. |
| **DOCUMENTATION FEE:** | $250.00 per schedule |

**EXHIBIT**

11

0314

Lease Proposal – Universal City, LLC
August 22, 2005
Page 2 of 3

**TERM/PAYMENT:** The lease will be for an initial term of 84 months commencing on the first day of the month following the delivery and acceptance of the equipment. The lease payment, payable in advance, will be based upon the lease rate factor of .01573.

To calculate the monthly payment, multiply the lease rate factor by the total cost. All applicable taxes shall be added to the monthly payment.

**END OF INITIAL LEASE TERM:** Lessee shall purchase the equipment for a $1.00 acquisition cost or extend the lease for twelve (12) months.

**BILLING:** The delivery and installation of the equipment will occur over a 90-day period. CEF has agreed to fund each invoice as received and accepted during the 90-day installation period. The initial term of the lease shall commence on the first day of the month following the 90-day period. CEF shall pay rent for accepted equipment equal to the monthly Lease Rate Factor (x) total equipment cost. It is the intent of CEF to commence each 90-day period on the first of the following month.

**PERSONAL GUARANTY:** This lease will require the personal guaranty of Fred Beasley.

**CONTINGENCIES:** This lease proposal is intended only to facilitate documentation of a financing or equipment lease. Each of the following contingencies must be satisfied, as determined by CEF in its discretion, before the final documents for an equipment lease based on this proposal will be executed by CEF.

1. The terms outlined in this proposal shall have been reduced to a definitive written Master Lease (including all applicable Riders and Exhibits), all of which shall be subject to final approval by Senior Management of CEF and by Lessee prior to the execution date. Delivery of this proposal to Lessee does not obligate CEF or Lessee to enter into a lease. Until the Master Lease documents are signed by both parties, CEF or Lessee is not subject to any obligation to enter into a lease or provide any financing on these terms.

2. No adverse material change in the financial condition of Universal City, LLC shall have occurred between the date of this proposal and the date of any future lease fundings.

3. The terms in this proposal are based on current financial market conditions. With respect to equipment deliveries occurring more than thirty (30) days after the date of this proposal, the financial terms herein will be adjusted at any time prior to delivery and acceptance of the equipment to reflect any increases in the treasury rates used to determine the terms set forth in this proposal. The benchmark T-Bill rate for 84-Months is 4.21, as of August 12, 2005.

4. Creative Equipment Funding LLC reserves the right of first refusal on any future financing program for equipment offered to Universal City.

0315

Lease Proposal – Universal City, LLC
August 22, 2005
Page 3 of 3
_____

DEPOSIT:             A deposit equal to one month's payment will be collected upon the
                     commencement of each new schedule. The deposit will be applied to
                     Lessee's last rent payment.


Mr. Brew, if the terms of this proposal meet with your approval, please sign and return
this letter and the requested credit information at your earliest convenience. Unless
accepted, this proposal will expire on November 31, 2005. Creative Equipment Funding,
LLC appreciates this opportunity to provide financing assistance to Universal City, LLC.
Please do not hesitate to call me if you have any questions regarding this proposal.


Sincerely,                                      Agreed to and Accepted By:
**Creative Equipment Funding, LLC**


Chris Shields
Business Development Manager
                                                By: _____

                                                Title: _____

                                                Date: _____


0316

## AFFIDAVIT OF FRED BEASLEY

STATE OF _Alabama_ )
COUNTY OF _Montgomery_ )

Personally appeared before me, the undersigned Notary Public, in and for said County

and State, Fred Beasley who, after being duly sworn, did depose and state on oath as follows:

1.    My name is Fred Beasley.  I am manager of Universal City, LLC.  Universal

City and I have been named as defendants in Case Number 2:05 CV 996-WKW presently

pending in the United States District Court for the Middle District of Alabama.  I make this

affidavit in support of a Motion for Summary Judgment filed in that case.

2.    I planned and still plan to open an entertainment complex in Montgomery,

Alabama.  In Spring, 2005, William Brew told me that he had extensive experience in this

type business.  In April 2005, I signed a contract termed "Management Agreement" on behalf

of Universal City.  Brew, president of Top Notch Consulting, Inc., signed the contract on

behalf of Top Notch.  That contract is the only contract signed on behalf of Universal City

and Top Notch.  This contract has been supplied to the Court as an attachment to Document

No. 29.  Brew proposed an amendment to which I never agreed and that I refused to sign.

3.    Pursuant to our contract, I paid Brew over $25,000.00 in addition to expenses

for April, May, June, July and August, 2005.  During this time, it became apparent to me that

Brew was unable to do the things he had promised when we first discussed my project.  In

addition, I was advised by other persons to be very careful in my dealings with Brew.

Finally, I learned that Brew was trying to negotiate sales commissions for himself with

EXHIBIT

12

vendors he was dealing with for Universal City.

4.    Because of all of these things, I terminated the contract between Universal City and Top Notch on August 30, 2005. I informed Brew of this termination on the telephone and through a series of e-mails. I attempted to send a certified letter to Brew several times but Brew refused to accept it. He finally accepted the letter in October, 2005.

5.    No lender made a firm loan commitment during the time Top Notch was under contract. My project is ongoing and no lender with whom Top Notch negotiated will be involved in the project. The final loan will not involve any lender with whom Top Notch negotiated.

6.    After Brew left Montgomery, my sister went to his apartment to clean it. She found a file containing the name and telephone number of a lady in California, Sharon Ringgenberg. I called Ms. Ringgenberg to ask if she wanted the papers. She could not understand why these papers were in Montgomery. After we had talked for a while, she asked if I was a professional athlete. When I told her that I was, she told me that William Brew had told her that I was going to invest in a horse farm project that he was putting together for her. It is my recollection that she believed I was going to invest $900,000.00 in her horse farm. I had never heard of her.

7.    Brew prepared a "Business Plan" while Top Notch was under contract. It was of no use in obtaining financing and another had to be prepared after I terminated the contract. No document, plan, drawing or thing of any description prepared by Brew or Top Notch has been used or will be used in my project. I have given no one any document of any

description prepared by Brew or Top Notch.

**Further affiant sayeth not.**

FRED BEASLEY

STATE OF _Alabama_ )
COUNTY OF _Montgomery_ )

I, the undersigned, a Notary Public in and for said State and County, hereby certify that FRED BEASLEY, whose name is signed to the foregoing Affidavit and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same voluntarily.

Given under my hand and official seal on this the _6th_ day of November, 2006.

[SEAL]

NOTARY PUBLIC
My Commission Expires: _8/20/07_

# AFFIDAVIT OF CHRIS SHIELDS

STATE OF Colorado )
COUNTY OF Denver )

Personally appeared before me, the undersigned Notary Public, in and for said County

and State, Chris Shields who, after being duly sworn, did depose and state on oath as follows:

1.      My name is Chris Shields.  I am Business Development Manager with

Creative Equipment Funding, LLC.  I am familiar with the facts related in this affidavit.

2.      I have been provided a copy of the response to Interrogatory No. 13 and a letter

from me to William Brew concerning William Brew's dealings with CEF.  In that response,

Mr. Brew states that he "negotiated a $1,500,000.00 line of credit on a lease purchase

arrangement."  He says that "this was approved on August 22, 2005."  Finally, he says that

a letter from me stated that this had been approved.

3.      This is false.  I had never dealt with Mr. Brew before I was approached through

Goodwin Brothers, Inc., a vendor in Montgomery with which my company does business.

There was no guaranteed loan commitment for this project.  The only conversations I had

with Mr. Brew involved negotiations and tentative offers.

4.      I have not heard from Mr. Brew or any attorney representing Mr. Brew since

he was terminated by Mr. Beasley.  If either Mr. Brew or his attorney had asked, I would

have explained to them that CEF never approved any line of credit.

**Further affiant sayeth not.**

**EXHIBIT**

13

CHRIS SHIELDS

STATE OF _Colorado_ )
COUNTY OF _Denver_ )

I, the undersigned, a Notary Public in and for said State and County, hereby certify

that CHRIS SHIELDS, whose name is signed to the foregoing Affidavit and who is known

to me, acknowledged before me on this day that, being informed of the contents of the

instrument, he executed the same voluntarily.

Given under my hand and official seal on this the _14_ day of July, 2006.

[SEAL]

NOTARY PUBLIC
My Commission Expires: _12/15/2008_

JENNIFER M. WALLACE
NOTARY PUBLIC
STATE OF COLORADO

-2-

## AFFIDAVIT OF JAMES G. SMILEY, III.

STATE OF ___North Carolina___          )
COUNTY OF ___Mecklenburg___          )

Personally appeared before me, the undersigned Notary Public, in and for said County and State, James G. Smiley, III. who, after being duly sworn, did depose and state on oath as follows:

1.     My name is James G. Smiley, III.  I am Vice President, Credit and Finance, Brady Distributing Company.  I make this affidavit from my own personal knowledge and from my review of records maintained by Brady Distributing Company pertaining to its dealings with Universal City, LLC.

2.     I have reviewed what is described to me as the response of William Brew to "Interrogatory No. 14" which purports to relate an approval of a line of credit in the amount of $600,000.00 by Brady Distributing Company.  Mr. Brew references a letter from me delivered August 31 by facsimile.

3.     That letter was sent to Mr. Brew after repeated requests by him.  I understand now that he had been terminated by Fred Beasley the day before he asked me to fax the letter. The letter is not a guaranteed loan commitment.  It states that the "approval is subject to the final bank underwriting requirements." In other words, Brady was not going to make a loan. Brady was going to take the application submitted by Universal City to its bank and let the bank make that decision.  Any loan would have required the approval of Brady's bank, the personal guarantees of Mr. and Mrs. Beasley and a down payment of $120,000.00.  To refer

**EXHIBIT**

14

to my letter of August 31 as a "final approval letter" mischaracterizes my letter.

4. I have not been contacted by Mr. Brew in almost a year. I have never been contacted by Mr. Brew's lawyer. If I had, I would have told either of them the facts as reflected in this affidavit and would have explained that Brady Distributing Company never approved a line of credit in the amount of $600,000.00.

**Further affiant sayeth not.**

_James G. Smiley, III._
**JAMES G. SMILEY, III.**


STATE OF North Carolina )
COUNTY OF Mecklenburg )

I, the undersigned, a Notary Public in and for said State and County, hereby certify that JAMES G. SMILEY, III., whose name is signed to the foregoing Affidavit and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same voluntarily.

Given under my hand and official seal on this the 14th day of July, 2006.

[SEAL]

_Shaun Chaulers_
NOTARY PUBLIC
My Commission Expires: 9-29-08

# AFFIDAVIT OF ROB HERTENSTEIN

STATE OF _Alabama_ )
COUNTY OF _Montgomery_ )

    Personally appeared before me, the undersigned Notary Public, in and for said County and State, Rob Hertenstein who, after being duly sworn, did depose and state on oath as follows:

    1.    My name is Rob Hertenstein.  I am Senior Vice President and Commercial Lending Manager of Colonial Bank.  In the Summer of 2005, I was Senior Vice President and Corporate Banking Manager at Compass Bank.  I make this affidavit from my own personal knowledge of the facts related herein.

    2.    I have been provided the response of William Brew to an Interrogatory No. 11. In that response, Mr. Brew states that he negotiated a $100,000.00 "loan" and that it "was based upon his efforts" that this "loan" was made by Compass Bank.

    3.    In fact, Compass Bank established a $100,000.00 line of credit for Fred Beasley based upon his signature on the application.  No "business plan" was required by the bank for the purpose of the $100,000 line of credit.  Mr. Brew provided me what he termed a "business plan."  This document was inadequate for any loan consideration and, in my judgment, provided no real information to a lender.  Mr. Beasley's credit was sufficient for the line of credit established by Compass Bank.

    4.    Mr. Brew also states that he was told that a $900,000.00 loan "was approved" by Compass Bank.  This is false.  Compass Bank never committed on a loan of $900,000.00

**EXHIBIT**

15

on this project and such a loan was never approved. Mr. Brew could not have been told that any

loan had been approved in that amount.

5.      I recall that Mr. Brew left Montgomery in late August or early September,

2005. Since that time, I have not talked to Mr. Brew or any attorney representing him. If I had

been asked by Mr. Brew or his attorney about what my testimony would be, I would have told

them what I have stated in this affidavit.

**Further affiant sayeth not.**

**ROB HERTENSTEIN**

STATE OF _Alabama_   )
COUNTY OF _Montgomery_   )

I, the undersigned, a Notary Public in and for said State and County, hereby certify that

ROB HERTENSTEIN, whose name is signed to the foregoing Affidavit and who is known to

me, acknowledged before me on this day that, being informed of the contents of the

instrument, he executed the same voluntarily.

Given under my hand and official seal on this the _30th_ day of July, _August_ 2006.

[SEAL]

NOTARY PUBLIC
My   Commission   Expires:

_8/20/07_

August 31, 2005

I, Frederick Beasley, am terminating the contract with William Brew as of today August 31, 2005.

Please return all equipment, contracts and documents concerning Universal City.

Thank you for your time and effort.

Sign

**EXHIBIT**

16



FREDRICK BEASLEY

S. FRANCISCO 49ERS
4949 Centennial Blvd.
Santa Clara, California 95054-1229



UNITED STATES POSTAGE
$00.370
021A
0004890702   OCT 07 2005
MAILED FROM ZIP CODE 95054

CERTIFIED MAIL

7004 2890 0004 6270 0532

William Brew
1039 Ramona Ave.
Albany, CA 94706

34706+2337-39   C073

PLAINTIFF'S
EXHIBIT
"E"

Case 2:05-cv-00996-WKW-WC    Document 54    Filed 12/07/2006    Page 45 of 62
Fw: Re: Hey
Case 2:05-cv-00996-WKW-VPM    Document 46    Filed 08/28/2006    Page 17 of 47    Page 1 of 1

| | This message has been scanned for known viruses. |
|---|---|
| **From:** Frederick Beasley | |
| **To:** Fred Beasley | |
| **Subject:** Fw: Re: Hey | |
| **Date:** Thu, 20 Oct 2005 22:45:04 -0500 | |

-----Original Message-----
From: William Brew <williamebrew@tmail.com>
To: Frederick Beasley <freddieb40@tmail.com>
Subject: Re: Hey
Date: Tue, 30 Aug 2005 19:10:21 -0700

Cool.
On Tue, 30 Aug 2005 7:08 pm, Frederick Beasley wrote:
> Well Brew I guess I will be joining ur resume of law suits bc I'm not > paying u another dime. I'm ready when u ready
> --freddieb40
--williamebrew
--freddieb40

EXHIBIT

17

PLAINTIFF'S
EXHIBIT
17

## Mark Chambless

| | |
|---|---|
| **From:** | "William Brew" <williamebrew@tmail.com> |
| **To:** | "Mark Chambless" <mchambless@chambless-math.com> |
| **Sent:** | Tuesday, September 13, 2005 2:18 PM |
| **Subject:** | Fw: Stolen property |

-----Original Message-----
From: Frederick Beasley <freddieb40@tmail.com>
To: William Brew <williamebrew@tmail.com>
Subject: Stolen property
Date: Tue, 13 Sep 2005 14:15:41 -0500

I can accept the fact that you are con-artist, and hugh lier, because
that's just your nature I understand that. One thing I can't accept and
that really get under my skin the reason me calling you is when someone
steal from me, then try play me for a idot. You know damn well you had
no attentions of bring me shit nor thinking I had a check waiting on
you. Bring my shit to 49ers head quarters I told you in my last email I
sent on Sept 11, I giving you a week to do it.
4949 Centennial Blvd
Santa Clara

P. S. Will you please stop lying to people bout you still work for me bc
you don't and you never will again..
--freddieb40
--williamebrew





9/13/2005



# CORPORATE DETAILS

## Office of the Secretary of State
## State of Alabama

---

**INITIATE NEW BROWSE**

```
Company                                                    DLL 480-739
  Legal Name:   Beasley Development Company, LLC

County Filed:   Montgomery County

Formed Date.:   06-28-2006

Report Date.:   * Not On Data Base

Reg Agent...:   BEASLEY, FREDERICK
                ATLANTA CROSSING SHOPPING CENTER
                5544 ATLANTA HWY
                MONTGOMERY, AL  36124

Prin Address:   MONTGOMERY, AL

Offc Of Rec.:   * Not On Data Base

Capital Amt.:   * Not On Data Base

Nat Of Bus..:   FOOD/ENTERTAINMENT SERVICES

Members.....:   BEASLEY, FREDERICK
```

**TRANSACTION LIST**

**← PREVIOUS PAGE**



---

© 2006, Office of the Secretary of State, State of Alabama

**EXHIBIT**
_____19_____



PLAINTIFF'S
EXHIBIT
"C"



# CORPORATE DETAILS

## Office of the Secretary of State
## State of Alabama

---

**INITIATE NEW BROWSE**

```
Company                                                        DLL 464-086
  Legal Name:    Universal City, L.L.C.

County Filed:    Montgomery County

Formed Date.:    05-11-2005

Report Date.:    * Not On Data Base

Reg Agent...:    BEASLEY, FRED
                 1661 EASTERN BYPASS
                 MONTGOMERY, AL  36117

Prin Address:    MONTGOMERY, AL

Offc Of Rec.:    * Not On Data Base

Capital Amt.:    * Not On Data Base

Nat Of Bus..:    REAL ESTATE DEVELOPMENT

Members.....:    BEASLEY, FRED
```

**← PREVIOUS PAGE**



---

© 2006, Office of the Secretary of State, State of Alabama

**EXHIBIT**

20



PLAINTIFF'S
EXHIBIT
"D"

**UNITED STATES DISTRICT COURT for the**
**MIDDLE DISTRICT of ALABAMA**

| | |
|---|---|
| TOP NOTCH CONSULTING, INC. | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) CASE NO.   2:05-cv-996-MHT |
| | ) |
| UNIVERSAL CITY, LLC.; and | ) |
| FREDERICK J. BEASLEY, III | ) |
| | ) |
|     Defendants. | ) |

## BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO
## DEFENDANTS MOTION FOR SUMMARY JUDGMENT

**COMES NOW**, the Plaintiff, Top Notch Consulting, Inc., by and through his undersigned counsel, and respectfully files this Brief in Support of its Response to Defendant's Motion for Summary Judgment and states that the motion is due to be denied as to each count of the complaint.

## INTRODUCTION

The Defendant correctly sets out the four counts alleged in the Complaint. The Defendant's counsel without inquiry has alleged that Counsel for Plaintiff has not discussed the merits with any witnesses named in the responses to discovery. Plaintiff's counsel has meet with potential witnesses and discussed the facts with witnesses and the same are set out herein.

Defense counsel objects to the discovery answers alleging the same to be confusing and in narrative format yet asked broad open ended questions which required Plaintiff to recount every action, every telephone call, every communication ne made with hundreds of persons over five month period of time. The answers were offered in good faith response to the open ended questions.

The gravamen of this matter is a written contract between Top Notch and Universal City and implied contract between Top Notch and Fred Basley. Both contracts required the good faith efforts and fair dealings of the Defendants. The documents themselves, without argument of counsel or affidavit of the parties, show there to be genuine issues of material facts. The affidavit of the Defendant admits that the commissions due under written contract or earned by the Plaintiff, Top Notch Consulting, Inc., have not been paid and therefore the resulting damage. The Motion for summary judgment is due to be denied based upon the exhibits attached hereto. The motion is due to be denied based upon the affidavits of Plaintiff and Defendant and others. There are genuine issues of material fact.

1

**EXHIBIT**

21

## STATEMENT OF UNDISPUTED FACTS

1.  William E. Brew is the sole shareholder and owner of Top Notch Consulting, Inc.
2.  Top Notch set out four (4) counts in the complaint filed in this matter.
3.  The Plaintiff alleged in the complaint counts for:
    I       Breach of Contract;
    II.     Interference with Business Relations;
    III.    Violation of Alabama's Trade Secrets Act; and
    IV.     Quantum Meruit as to Fred Beasley
4.  Top Notch developed a business plan and concept that the Defendant, Fred Beasley desired to duplicate in the Montgomery community and therefore approached William Brew about the same.
5.  This business concept was of such a unique nature that the Defendant contracted with William Brew to come to Montgomery to establish the concept and open a similar business.
6.  After the contract the contract was signed on April 28, 2005, Fred Beasley formed Universal City, LLC, on May 11, 2005.
7.  Mr Brew informed Mr. Beasley that the approximate cost of opening a facility similar to that in California would be between $2,500,000.00 and $3,000,000.00.
8.  Mr. Beasley informed Mr. Brew that he had the financial ability to open such a facility. Mr Brew was not informed by the Defendant, Fred Beasley, that obtaining financing for the project would be questionable or difficult but on the contrary informed Plaintiff that he would be required to simply "secure funding".
9.  Mr. Beasley promised to pay the Plaintiff a sum equal to 10% of the anticipated costs of opening the business if the Plaintiff were willing to relocate to Montgomery to establish and set up the business "upon the final closing".
10. This fee or commission was not contingent as per the written contract.
11. This 10% fee was to be paid "upon closing the final loan". Top Notch was to be paid the additional monthly sum of $5,000.00 during the start up period until a total of $25,000.00 was paid. (See Exhibit 1, paragraph 4).
12. This contract was agreed to and signed in April 2005.
13. The anticipated length of time required to open the facility was expected to be four to five months.
14. Mr. Brew moved to Montgomery Alabama and left his family in California, expecting to be in Montgomery approximately five (5) months.
15. Mr. Brew substantially performed each and every duty required under the contract.
16. Commitment letters were issued by Citibank to Fred Beasley on June 16, 2005 totaling $1,950,000.00 which would result in "**$831,000.00 cash back**" for this project.
17. Each commitment letter begins with and clearly states, "<u>CONGRATULATIONS! Your mortgage has been approved"</u>.
18. These loans were conditioned only upon closing which Fred Beasley has refused to do or to assist in from June 16, 2005 through the date of this brief.

2

19.    As per the contract, the Plaintiff is entitled to 10% of $831,000.00 or $83,100.00. This has not been paid to the Plaintiff.

20.    Fred Beasley refused to cooperate and deal in good faith or otherwise perform fairly as required by the contract and the implied contract with him by completing the requirements to close this loan commitment

21.    A commitment letter was issued by Brady Distributing on August 31, 2005 in the amount of **SIX HUNDRED THOUSAND DOLLARS ($600,000.00).**

22.    This commitment states, "We are pleased to provide a financing commitment based upon the terms and conditions outlined below".

23.    Fred Beasley refused to cooperate and deal in good faith by completing the requirements to close this loan commitment.

24.    In the affidavit of James G. Smiley, III, he clearly states that the loan was conditioned upon the good faith efforts of Fred Beasley to assist in obtaining final bank underwriting, that was the sole requirement to close the loan and obtain $600,000.00 in financing.

25.    Brady continues to be involved in this project as James G. Smiley, III, issued an affidavit and if his company was terminated he would have indicated in the affidavit that the business relationship ended when Top Notch was terminated.

26.    As per the contract, the Plaintiff is entitled to 10% of $600,000.00 or $60,000.00. This has not been paid to the Plaintiff.

27.    A commitment letter was issued by CFE, Inc., in the amount of **ONE MILLION FIVE HUNDRED THOUSAND DOLLARS, $1,500,000.00, lease purchase option.**

28.    This lease purchase agreement contained nominal conditions that could easily be meet by Universal or Fred Beasley which he refused to do.

29.    In the affidavit of Chris Shields, he makes it clear that the lease was not canceled or terminated but had not been finally approved.

30.    This lease like the other loan commitments was conditioned upon the good faith performance of Fred Beasley.

31.    Mr. Beasley refused to cooperate or act in good faith in the financing beginning in August and after obtaining the commitment letters referenced above, terminated Plaintiff.

32.    As per the contract, the Plaintiff is entitled to 10% of $1,500,000.00 or $150,000.00. This has not been paid to the Plaintiff.

33.    Mr. Brew contends that he was required to arrange financing though several vendors and from several sources as it became apparent in July that Mr. Beasley did not have the ability of simply "secure funding" as claimed.

34.    Mr. Beasley and Universal City, LLC, knew that when the financing was finalized, Top Notch would be entitled to 10 % of the loans or approximately $293,100.00.

35.    The alleged reasons for the termination as set out in the affidavit of Fred beasley are a mere subterfuge to save on the contract fee of 10%.

36.    Fred Beasley formed a new company named Beasley Development Company, LLC in June of 2006 as a subterfuge to avoid paying the fees due when the final judgement

3

is issued against Universal City, LLC.

37. Mr. Beasley refused to cooperating in obtaining the financing to fund the project. Fred Beasley refused to close on the mortgage loans, to sign the lease purchase agreement or follow up on the conditions required by Brady and CEF.

38. By the beginning of August 2005, the Plaintiff had substantially completed all duties under the contract to such an extent that all equipment was selected, and loan commitments in the amount of $2,931,100 had been arranged. Top Notch had substantially performed under the contract and was entitled to the commissions or fees.

39. Fred Beasley did not act in good faith or the loans, the lease purchase and the mortgage loans, would have closed.

40. Fred Beasley did not act fairly or perform his required duties under the contract or the loans, the lease purchase and the mortgage loans, would have closed.

41. Universal City, LLC through its sole member, Fred Beasley, did not act in good faith or the loans, the lease purchase and the mortgage loans, would have closed.

42. Universal City, LLC through its sole member, Fred Beasley, did not act fairly or perform its duties required under the contract or the loans would have closed.

43. The securing of financing was completely dependent upon the good faith efforts and fair dealings of the defendants both, Universal City, LLC and especially Fred Beasley, in that the credit rating, name and cooperation of Fred Beasley was totally required to obtain even $1.00 in financing.

44. Mr. Beasley refused to proceed to loan closing, lease signing or to the mortgage closing and refused to sign the necessary documents to obtain the financing arranged by the Plaintiff.

45. On August 31, 2005 after receiving commitment letters offering credit to fund the project in the amounts exceeding $2,931,100.00, Fred Beasley terminated the contract.

46. The actions of Mr. Beasley terminating Top Notch were done in bad faith with the clear intent to prevent the payment of the commissions due to Top Notch.

47. The claims set out in the affidavit of Mr. Beasley asserting that Plaintiff "was unable to do the things he promised" is outlandish and a subterfuge and evasion of good faith and fair dealing as required by the contract.

48. The defendant offers no letter, email or other written document complaining about the performance of Top Notch prior to August 30, 2005 as there is no such document. This is proof of mere subterfuge or at a minimum, substantial evidence of performance instead of the claims of the Defendant of non-performance.

49. The plans developed by Top Notch are still in use on this project and have not been returned to the Plaintiff in breach of the terms of the contract.

50. The project is now proceeding under the new business known as Beasley Development Company, LLC.

51. The project is ongoing and radio advertisements claim the project is to be opened under the name "Freddie B's" at the Atlanta Crossings Shopping Center in Montgomery, which is the new registered address for Fred Beasley.

4

52. All of the work product Top Notch created is still in use and being used on the project. No work product has been returned to Plaintiff. All information and work product of Top Notch was protected by written contract and implied contract with Fred Beasley.

53. The contract specifically protects the information and the same is being used by the defendants on this project without the written permission of Top Notch.

54. Top Notch is entitled to its commissions of 10% due to the willful failure of Defendants to close on financing, its bad faith and unfair dealings.

55. The termination of Top Notch does not relieve the Defendant from paying the fees and commission set out in the contract and the same is not dependent upon continued performance but merely upon closing the final loan.

56. The 10% commission was based solely "upon closing the final loan".

57. The contract was drafted by the attorney for Universal City, namely, Randolph Moore.

58. Fred Beasley has used the business plan and information obtained through the work of Top Notch to continue this project.

59. Mr. Beasley states in his affidavit that the project is continuing and he plans to open the business using the same concepts and business plan developed by Top Notch.

60. The contract protected the information developed by Top Notch which included the unique nature of the business plan.

## ARGUMENT

## SUMMARY JUDGMENT STANDARD

Under Ala. R. Civ. P. 56(c), summary judgment is proper "if the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact. *Ex parte Holland Mfg.* Co., 689 So.2d 65 (Ala. 1996); *Young v. La Quinta Inns, Inc.*, 682 So2d 402 (Ala. 1996). Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. *Bass v. Southtrust Bank of Baldwin County*, 538 So.2d 794, 797-798 (Ala. 1989).

Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the facts sought to be proved." *West v. Founders Life Assurance Co. of Florida* 547 So.2d 870, 871 (Ala. 1989). The letters offered by the Plaintiff from Citibank, Brady and CEF are such substantial evidence that fair minded persons

could infer the existence of facts.

## COUNT I: BREACH OF CONTRACT

Count I of Plaintiff's Complaint is for breach of contract.  In the ordinary breach of contract action, the claimant must prove: (1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *Southern Medical Health Systems, Inc. v. Vaughn*, 698 So.2d 98 (Ala. 1995).

The Plaintiff has meet the burden by offering substantial evidence of each of the above four requirements. As to requirement 1, both Plaintiff and Defendant admit that there is a signed contract between Top Notch and Universal City.  As to requirement 2, Top Notch has claimed by affidavit substantial performance and offered letters of financing from independent witnesses and sources in an amount exceeding $2,900,000.00. As to requirement 3, the Plaintiff offers many exhibits, affidavits, and his interrogatory answers.  There is substantial evidence presented herein of non performance of the defendant that fair minded persons could conclude a non performance or breach by defendants. As to requirement 4, the Plaintiff has similarly offered affidavits, exhibits, the contract and interrogatory answers.  Again, there is substantial evidence presented herein of non performance of the defendant that fair minded persons could conclude a non performance or breach by defendants.

There is no dispute as to whether there is a signed agreement but there is a dispute as to the interpretation of the terms set out in paragraphs 2, 3, 4 and 5 . The Plaintiff has asserts in this case that money is due under the terms of the contract.  Paragraph 4 sets out the compensation to be paid to Top Notch in exchange for the promises of performance set out in paragraph 2.  The 10% commission set out in paragraph 4 is not conditional nor is the same subject to the right of termination as alleged by Defendant and is contingent solely upon the closing of final loan. On the date of termination as will be shown below, Top Notch Consulting Inc., was entitled to the sum of approximately $250,000.00 due to substantial performance. Substantial performance is proven by the attached Exhibits marked Exhibit 0134; Exhibit 0137; Exhibit 0138; Exhibit 0139; Exhibit 0140; Exhibit 0317-0318; and composite Exhibits 0314-0316.

If the court disregards all Exhibits but for Exhibit 0134, a genuine issue of material fact exists and is created. Citibank asserts in this Exhibit that Fred Beasley can obtain $831,000 cash back within 2 weeks. This document reads, "CONGRATULATIONS! Your mortgage has been approved". This document alone shows that Plaintiff is entitled to $83,100.00 upon the good faith performance of Fred Beasley. This letter creates a genuine issue of material fact and shows that good faith efforts by the Defendants in performing under the contract are at issue. The Defendant in his affidavit asserts no efforts to complete this loan as he undertook no effort after July 30, 2005.  The Plaintiff asserts in affidavit that the Defendants did not cooperate in good faith in completing the loan.

6

Exhibit 0314 through 0316 prove that subject to the nominal conditions set out in the contingency section, that Top Notch had arranged for $1,500,000.00 in lease purchase funds from CEF. This letter creates a genuine issue of material fact and shows that good faith efforts by the Defendants in performing under the contract are at issue. The Defendant in his affidavit asserts no efforts to complete this loan as he undertook no effort after July 30, 2005. The Plaintiff asserts in affidavit that the Defendants did not cooperate in good faith in completing the loan. Again the Plaintiff claims substantial performance and breach by Defendants.

Exhibit 0298 proves that subject only to bank underwriting, that Top Notch had arranged for $600,000.00 in purchase funds from Brady. This letter creates a genuine issue of material fact and shows that good faith efforts by the Defendants in performing under the contract are at issue. The Defendant in his affidavit asserts no efforts to complete this loan as he undertook no effort after July 30, 2005. The Plaintiff asserts in affidavit that the Defendants did not cooperate in good faith in completing the loan. Again the Plaintiff claims substantial performance and breach by Defendants.

The Defendant asserts, as to the alleged breach, that he terminated the contract on August 30, 2005. See the attached Exhibits E, F and G, setting out the alleged termination. The contract allows for the termination of the Plaintiff upon 30 days written notice. Therefore, if the Plaintiff was terminated on August 30, 2005, the effective date was September 30, 2005. Certainly sufficient time to complete the loan transactions approved by the three vendors and listed above.

Notwithstanding the potential right of the defendants to terminate the contract, the contract does not state in the termination provision drafted by Defendant's counsel that the 10 % commissions will not become due after termination. Had the Defendant's desired the right to terminate the contract and escape liability for the 10% commissions, the defendants should have had his attorney draft such language into the termination provision. In fact the language is clear, that the commissions are due "upon closing the final loan". The Plaintiff asserts that a genuine issue of material fact exists as to whether the Defendant has the right to terminate the contract and avoid payment of the commission after the Plaintiff has arranged $2,931,000.00 in potential financing. This ambiguity should be interpreted against the drafter. Even excepting this point of law, the contract does not authorize the termination of the right to commissions.

The original contract was prepared by and drafted by the attorney for Universal, namely Randolph B. Moore. See Plaintiff's answer to interrogatory 10. This fact is not disputed. Any ambiguity in the language must be interpreted against the drafter or the Defendant. *SouthTrust Bank v. Copeland One, L.L.C.*, 886 So.2d 38, Ala.,2003. Whether the Defendant could terminate the Plaintiff before paying commissions and closing on the loans to save the commissions is a genuine question of material fact. The contract does not set out this right. The commissions due under paragraph 4 are not tied to the termination provision and could have been drafted by Defendants' counsel to state the same if that was the intent. This ambiguity should be interpreted in Plaintiff's favor.

Every contract contains an element of good faith and fair dealing. This contract concept is

7

set out in Alabama case law and the restatement of contracts at §205. In Alabama all contracts have as an element "good faith and fair dealing" and this is imposed upon the parties. "Under any interpretation [of a promise conditional on personal satisfaction], the exercise of judgment must be in accordance with the duty of good faith and fair dealing..." *U.S. v. Forney*, 9 F.3d 1492, C.A.11 (Fla.),1993. Good faith has been defined in Alabama as "honesty in fact in the conduct or transaction concerned.". To allow the Defendant the right to use subterfuge and excuse to terminate Plaintiff to prevent the payment of the commissions would be to allow bad faith, unfair dealing and subterfuge. As long as the contractual terms are clear and unambiguous, questions of their legal effect are questions of law. When, as in this matter, any aspect of a contract is capable of more than one meaning, it is "ambiguous". *SouthTrust Bank v. Copeland One, L.L.C.* 886 So.2d 38, Ala 2003. Any ambiguity in a contract must be construed against the drafter of the contract.

In this case, the Defendants position is that the Plaintiff could be terminated any day up to the day of the final closing and the commissions would not be due. This is not what the contract states and is not what the parties set out in the contract and such an interpretation is not consistent with the doctrine of good faith and fair dealing. This position flies into the face of good faith. Equity abhors shams and subterfuges, and delights in looking through the mere surface and form of a transaction, and in scrutinizing closely the merits and substance. *Harris v. Theus*, 149 Ala. 133, 43 So. 131, Ala. 1907. In this case it appears that the Plaintiff was terminated on the very eve of the date payment of commission was due in order for Defendant to save $250,000.00 contractually required to pay.   This creates a material issue of fact.

The  concepts of contract law of good faith and fair dealings and substantial performance protect persons like the Plaintiff from being terminated with or without cause that would result in a windfall benefit to the other party. In this case, Plaintiff has presented to this court proof that up to $2,931,000.00 in loan proceeds were available to Defendant but the Defendant, Fred Beasley was required to act in good faith to assist in the final closings.  The Plaintiff presented each of these commitment letters to the defendant, Fred Beasley and requested his assistance in moving the loans forward to close but received no assistance. This is bad faith. This is not fair dealings.  There is a genuine issue of material fact.

The contract was also breached by the Defendants when they refusal to return to documents and other materials prepared by Top Notch. Paragraph 3 of the contract states that, "Universal agrees that they shall treat all materials prepared by Top Notch as confidential and shall not disclose, copy, or share such materials without the written permission of Top Notch". No such authority was granted in writing or otherwise. Universal and now Fred Beasley have used the work product of Top Notch to continue the project under the name Beasley Development Company, LLC. The affidavits prepared for Defendant and presented to this court by two vendors selected by Top Notch have issued affidavits which do not state that the business relationships were terminated and Plaintiff has been informed that the relationships are continuing.  This is a material breach of the contract. A genuine issue of material fact exists in that the materials were not returned to the Plaintiff. A genuine issue of fact exists as to whether the documents and other materials prepared by Top Notch were used and the damages that occurred for the use of same.

8

The Plaintiff has alleged in answers to interrogatories and by affidavit submitted herein that Top Notch had substantially performed under the contract. *Bruner v. Hines,* 324 So. 2nd 265 (1975). A party is entitled to recover the contract price, less the reasonable costs of remedying any non performed work. *Bruner et seq.* The Plaintiff had substantially performed. See Plaintiff's answers to interrogatory questions 11, 12, 13, 14 an 15 and 27 and affidavit of Plaintiff. These create a genuine issue of material fact.

There is a genuine issue of material fact as to whether the amendment was adopted by the parties. The agreement was created to extend the management contract to the opening date since the project did not close during the initial five month term of monthly payments as expected. The monthly payments of $5,000.00 would be extended until the opening date. The Plaintiff acknowledges that the original Management Agreement contains a provision that states in paragraph 12 that, "This agreement shall not be changed, modified, or amended except in writing and signed by all parties". This language was inserted in said agreement and inures to the mutual benefit of both parties and is common in written contracts. Notwithstanding this clear language, Alabama, along with many other states, has long stated and adopted the contract rule that contracts can be modified by subsequent oral agreement. The Alabama Supreme Court has restated this principal in two recent cases. These case are: *Cook's Pest Control, Inc. v. Rebar*, 852 So.2d 730, Ala.,2002 and *Ex parte Coleman*, 861 So.2d 1080, Ala.,2003.

Specifically the Supreme Courts has held that, "Under Alabama law a written agreement may be modified by a subsequent oral agreement of the parties, unless some statutory provision provides otherwise.... This is so even where the contract contains a requirement that all modifications be in writing.". *Watson v. McGee,* 348 So.2d 461, 464 (Ala.1977). This writer could find no Alabama Statute prohibiting the oral modification of written contract. The contract was presented to the Defendant through his local counsel. The contract was signed by the Plaintiff and presented to the Defendant. Whether this contract amends the original language is a question of fact and a material issue of fact.

The Defendants present no argument in the motion to strike this amendment to the contract other than the same is unsigned. When considering a summary judgment motion, the court must accept the tendencies of the evidence most favorable to the nonmoving party and must resolve all reasonable doubts in favor of the nonmoving party. Rules Civ.Proc., Rule 56(c). If substantial evidence in the record supports a cognizable claim pleaded by the Plaintiff, the Defendant is not due a summary judgment on that claim, even if the record also contains substantial countervailing evidence. Rules Civ.Proc., Rule 56(c)(3). The rule allowing proof of an oral modification of a contract, notwithstanding a requirement that all changes to a contract must be in writing, is based upon the premise that a party who has included such a provision in a contract for that party's benefit can certainly waive that provision. Summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rule 56(c)(3), Ala. R. Civ. P., and Dobbs v. Shelby County Econ. & Indus. Dev. Authority, 749 So.2d 425 (Ala.1999). The court must accept the tendencies of the evidence most favorable to the nonmoving party and must resolve all reasonable doubts in favor of the nonmoving party. *System*

*Dynamics Int'l, Inc. v. Boykin*, 683 So.2d 419 (Ala.1996). If substantial evidence in the record supports a cognizable claim pleaded by the plaintiff, the defendant is not due a summary judgment on that claim, even if the record also contains substantial countervailing evidence. *See Hollingsworth v. City of Rainbow City,* 826 So.2d 787 (Ala.2001); McGinnis v. Jim Walter Homes, Inc., 800 So.2d 140 (Ala.2001); *Ex parte Alfa Mut. Gen. Ins. Co.,* 742 So.2d 182, 184 (Ala.1999).

The Motion for Summary Judgement as to Contract is due to be denied.

## COUNT II: INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS

This claim is asserted against Fred Beasley in his individual capacity. To support a claim based on tort of intentional interference with business or contractual relations, plaintiff must prove existence of contract or business relation, Defendant's knowledge of contract or business relation, intentional interference by defendant with contract or business relation, and damage to plaintiff as a result of defendant's interference. *Henderson v. Early*, 555 So.2d 130, Ala.,1989. Alabama has recognized the right to sue corporate officers or directors who may individually commit tort of intentional interference with business or contractual relations to which their corporation or employer is a party. *Hickman v. Winston County Hosp. Bd.*, 508 So.2d 237, Ala.,1987. This is exactly what has occurred in this matter in that the sole and only member or officer of Universal City, LLC has taken all business information of Top Notch to his new company and to the new potential investors or loan companies. A *third party* who, with knowledge of the existence of a valid contract *between others,* interferes with its performance ⋯⋯ commits a tort. See *Hichman* supra. This is what occurred in this matter as alleged above, Fred Beasely interfered in the contract between Top Notch and Universal City. The Plaintiff has set out claims against Fred Beasley and shown there are genuine issues of material fact.

The first element of this tort is whether there is a contract. The parties have admitted that there is a signed contract which both of the parties have acknowledged. The second element is whether the Defendant had knowledge of the contract or business relations. Fred Beasley has admitted to signing the contract. There is no dispute that Fred Beasley had knowledge of the contract and business relation. The third element of this tort is whether there has been an intentional interference by defendant with contract or business relation. This element is disputed by the defendant and will discussed below. The fourth element of the tort is whether there has been damage to plaintiff as a result of defendant's interference. This element is disputed by the defendant and will discussed below.

The Defendant, Fred Beasley, on behalf of Universal City, LLC., terminated the contract, yet he asserts in affidavit that the project continued. Fred Beasley did not inform this court that he created a new business called Beasley Development Company, LLC., to continue the business plan by affidavit or otherwise but the Secretary of State records indicate the same. Fred Beasley did not state in the affidavit he submitted that all vendors, suppliers and other information or materials created by Top Notch are not being used. The contract has not been continued under the name of Universal but under a new name of Freddie B's as heard on the Montgomery radio stations. The

10

Defendant, Fred Beasley, has negotiated a lease under a name other than Universal at the Atlanta Crossing Shopping Center. Fred Beasely has stated in his affidavit that the project has not been terminated but is continuing and he hopes to open. The continuation of the project constitutes interference with business relations or contract. The information obtained by contract with Top Notch has been relayed and transferred to both Fred Beasley and is in use by him and is being used by his new company, Beasley Development Company, LLC.  These acts create a genuine issue of material fact.

In this case, the Defendant Fred Beasley has admitted that he was aware of the contract as he signed the contract for Universal City, LLC.  The Defendant Fred Beasley obviously knew of the contract and business relationship between Top Notch and Universal.  The record from the Secretary of State and the affidavit of Mr. Beasley show that the project is moving forward. This fact alone is sufficient proof to create a genuine issue of material fact as to whether there has been an interference with business relations.  The records also create a genuine issue of material fact as to why Fred Beasley formed a new company in June 2006 to conduct the business for Universal. Fred Beasley by stating that the project is continuing also creates an issue of material fact as to the purpose for forming Beasley Development Company, Inc. after this lawsuit was filed. The Plaintiff has alleged the damages and set out in the affidavit that he has suffered damages due to Fred Beasley using the information obtained from Universal and from Top Notch. A genuine issue of material fact exists.

The contract entered into by the parties was between Top Notch Consulting Inc and Universal City, LLC. The contract rights as set out inure to the benefits of these parties. Fred Beasley has taken the benefits of contract and work of Top Notch and transferred the same to his benefit or that of some other company controlled by himself.  The contract and lease is to be signed in the near future under some other name than Universal City, LLC or has been signed. Top Notch has stated in affidavit through William Brew that it has been damaged in that it has not been paid for the use of the business plan, the designs, materials and other work product. Top Notch has not been paid by Fred Beasley or Beasley development Company, LLC for the use of the materials. Top Notch has been damaged.

The Plaintiff has been informed that the name of the new company that has been assigned the information of Top Notch is known as Beasley Development Company, LLC. See Exhibit C. This record is from the secretary of state and shows the location of the new business to be opened. This is the company that has negotiated a lease and plans to open under then name of Freddie B's or some other similar name using the information, equipment, products, concepts and trade secret materials obtained from Top Notch.  The use of any information obtained from Top Notch or William brew and now being used by Beasley Development Company, LLC is an interference with business relations. This company was formed as a new company to avoid liability for the commissions due to Top Notch. Any transfer of information is an interference with business relations. Plaintiff has shown that there is a genuine issue of material fact as to the interference of the business relations and contract by Fred Beasley.

The defendant has taken the information, business plan, designs and other work product

11

developed by Top Notch to other funding sources. The defendant claims the project is ongoing but funding has been obtained from other sources so there had to be a use of the existing contract materials, designs and plans and the same presented to third parties. This contact would be with a third party. Any relay of the information to the new company of Fred Beasley, Beasley Development Company, Inc., constitutes a third party within the statute. Fred Beasley is a third party to the original contract. Fred Beasley has interfered with the business relations of Top Notch and Universal City. There is a genuine issue of material fact as to the damages and the interference.

The Motion for Summary Judgement as to Intentional Interference with Business relations is due to be denied as to Fred Beasley.

## COUNT III: VIOLATION OF ALABAMA'S TRADE SECRET ACT

The Plaintiff has alleged that the defendant Fred Beasley has violated the trade secrets act by disclosing the information obtained from Universal. What constitutes "trade secret" is question of fact for trial court. Code of Alabama 1975, §§8-27-2(1), *Public Systems, Inc. v. Towry,* 587 So.2d 969, Ala.,1991. The Defendant correctly cites Code of Alabama §8-27-3. The Defendant, Fred Beasley did disclose or use trade secrets to another, namely his new company Beasley Development Company, Inc. The business plan developed by Top Notch was unique and subject to protection of this Act.

The parties agreed that the information being developed was subject to protection in writing. The parties agreed that the materials and information developed for this project belonged to Top Notch. By placing in the contract paragraph 3, the parties agreed that the information was subject to protection. The parties agreed that all information and materials belonged to Top Notch and could not be used without its written permission. The fact that Fred Beasely is using the information acquired to continue in his efforts to open a facility is a violation of the Trade Secrets Act. This paragraph alone creates a material issue of fact.

Fred Beasley obtained the designs, business plan, work product and other written materials developed by Top Notch by terminating Top Notch and refusing to return the information stored in the Universal computer, in the business office and to return the papers, documents and business plans of Top Notch. This information was obtained by means of terminating Top Notch. This is not a proper means to obtain the information. The continued use of the materials by Fred Beasley or Freddie B's or Beasely Development Company, LLC, in developing this project is a violation of the written contract and this is known to Fred Beasley. The use of and disclosure of the information obtained is a breach of confidence placed in him by Top Notch. Fred Beasley knows that the information is protected by contract yet continues to use the materials to develop the business plan and open under the new corporate name Beasley Development Company, Inc. (See Exhibit C).

The information obtained and used to develop this business consisted of many drawings, elevations, methods of operation, technics for operating and special processes used by Top Notch

12

in its previous business. All such information constitutes Trade Secrets under §8-27-2. The Act was created and passed to protect persons who develop such "drawings, methods, techniques or processes". Top Notch has stated a claim against Fred Beasley under this statute. A material issue of fact exists as to how Fred Beasley is using the information obtained and whether the information has been past on to his new business or businesses.

The Motion for Summary Judgement as to Violation of Alabama Trade Secrets Act is due to be denied as to Fred Beasley.

## COUNT IV: QUANTUM MERUIT

Alabama authorizes a claim for quantum meruit when a contract is implied. *Mantiply v. Mantiply*, --- So.2d ----, 2006 WL 1304936, Ala.,2006. The Plaintiff sets out this claim or count against Fred Beasley. In this case there was a written contract entered into by and between Top Notch and Universal City, LLC. There was no written contract between Fred Beasley and Top Notch. When the contract was formed, the agreement was between Top Notch and Fred Beasley. This is shown by Exhibit D which proves that on April 28, 2005 when the contract was signed, there was no limited liability company in existence under the name Universal City, LLC. Notwithstanding this point, the parties agreed by implication that Fred Beasley would be involved and cooperate fully to see that financing the project would occur. The parties agreed by implication, that Top Notch would rely solely upon the good faith and fair dealings of Fred Beasley.

There was an implied contract between Top Notch and Fred Beasley. Fred Beasley and Top Notch and the company to be formed named Universal City, LLC knew that no financing could have been obtained in the name of Universal City, LLC as it was formed for this business. Fred Beasley and Top Notch agreed from the start that the project would be Fred Beasley's project and the name he selected was immaterial. The parties intended for Fred Beasley to act in good faith and to deal fairly with Top Notch in obtaining financing and assist in every aspect of starting up this new business. Ever aspect of the written contract that imposed a duty upon Universal City, LLC was implied upon Fred Beasley. Likewise, Fred Beasley expected every task set out in paragraph 2 of the contract to be fulfilled by William Brew. Because there is no written contract between Top Notch and Fred Beasley, quantum meruit is an appropriate remedy.

The Plaintiff restates in this section and argument as if fully set forth herein the arguments set out above in the undisputed facts and the argument on contract as to this count of quantum meruit against Fred Beasley.

In the affidavit of Rob Hertenstein, he clearly states that the business plan offered to Colonial Bank or Compass Bank as prepared by Top Notch on behalf of Universal City was "inadequate for any loan consideration and in my judgment, provided no real information to a lender. **Mr. Beasley's credit was sufficient for the line of credit...**" This affidavit proves that Mr. Beasley was required by the contract to participate in good faith in the business venture as his signature was sufficient. This point shows the value and importance of Mr Beasley's cooperation in that on this loan he did

13

agree and did sign and the bank issued $100,000.00. Universal City paid part of the 10% commission to Top Notch when this loan closed. The claims against Mr. Beasley are not contract claims but quantum meruit as there was no written contract between himself and Top Notch but was merely implied contract. *Mantiply v. Mantiply*, --- So.2d ----, 2006 WL 1304936, Ala.,2006. The contract performance of Fred Beasley is based upon quantum meruit.

The Motion for Summary Judgement as to Quantum Meruit is due to be denied as to Fred Beasley.

**WHEREFORE**, premises considered, the Plaintiff respectfully requests that the Court deny the Defendants Motion for Summary Judgement as to each count and allow the matter to proceed to jury trial on all issues .

**RESPECTFULLY SUBMITTED** this _____17th_____ day of December, 2006.

_____
MARK N. CHAMBLESS (CHA013)
Attorney for Plaintiff

OF COUNSEL:
Chambless Math ❖ Carr, P.C.
5720 Carmichael Road
Post Office Box 230759
Montgomery, Alabama  36123-0759
Telephone: (334) 272-2230

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing document upon all counsel and/or parties of record <u>as listed below</u> by depositing a copy of same in the United States Mail, postage prepaid, by hand delivery and by e-filing on this the _____17th_____ day of December, 2006.

Jeffery W. Smith, Esq.
Post Office Box 1110
Montgomery, AL 36101-1110

_____
OF COUNSEL