IN UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TOP NOTCH CONSULTING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | CASE NO.  2:05-cv-996-WKW |
| | ) | (WO) |
| | ) | |
| UNIVERSAL CITY, LLC, and | ) | |
| FREDERICK J. BEASLEY, III, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Top Notch Consulting, Inc. ("Top Notch" or "Plaintiff"), brings this action against Universal City, LLC ("Universal"), and its manager Frederick J. Beasley, III ("Beasley"), (collectively, "Defendants"), for breach of a contract in which Defendants hired Plaintiff to act as Defendants' agent in opening a restaurant in Montgomery, Alabama.  Plaintiff also asserts violations of Alabama's Trade Secrets Act, Ala. Code § 8-27-1 *et seq.* (1975), interference with business relations, and quantum meruit.

By Order (Doc. # 77) dated March 16, 2007, the Court granted in part and denied in part the defendants' Motion for Summary Judgment (Doc. # 47).  The reasons for that order are set forth below.  Also before the court are Defendants' Motions to Strike (Doc. # 33 and Doc. # 57).  For the reasons set forth below, the Motion to Strike (Doc. # 33) is due to be DENIED as moot, and the Motion to Strike (Doc. # 57) is due to be GRANTED to the extent that Plaintiff's Response to Defendants' Motion for Summary Judgment purports to establish factual statements or legal conclusions as undisputed between the parties.

## I. FACTS[1] AND PROCEDURAL HISTORY

The disputes which form the basis of Plaintiff's complaint arise from a contract between Universal and Top Notch. Beasley, an NFL football player, manages Universal. William Brew ("Brew") is president of Top Notch, a consulting company. On April 28, 2005, Universal and Top Notch entered into a Management Agreement ("Agreement"), intended by both parties to result in the opening of "an entertainment and restaurant business" ostensibly similar to an establishment owned and operated by Brew in California and frequented by Beasley (Compl. ¶¶ 6-7). The Agreement provides, in essence, that Brew will move to Montgomery and, working as Universal's representative, complete all of the necessary tasks, including creating a plan, obtaining financing, contracting with construction, engineering, architectural, and other companies, complying with governmental regulations, and establishing managerial procedures. (Agreement ¶ 2.) In exchange for Top Notch's work, the parties agreed to the following relevant provisions to compensate Top Notch:

> 3. <u>Agreement to Engage</u>: In consideration of this Agreement, Universal agrees that they shall treat all materials prepared by Top Notch as confidential and shall not disclose, copy, or share such materials without written consent of Top Notch.
>
> 4. <u>Compensation</u>: In consideration for the services enumerated above, Universal shall pay to Top Notch a management fee of $5000.00 per month beginning in May, 2005 and each month thereafter until $25,000.00 is paid, plus reasonable expenses to include lodging, food, and transportation to be approved by Universal.
> Upon closing the final loan a total percent of 10% will be split between mortgagee fees and expenses and Top Notch. All mortgagee expenses will be paid first and the balance of the 10% will be paid to Top Notch.

---

[1] For purposes of Federal Rule of Civil Procedure 56, the court construes the disputed facts in favor of the Plaintiff. Defendants filed a Motion to Strike Plaintiff's Statement of Undisputed Facts (Doc. # 57) concerning the fact-section of Plaintiff's Reply to Defendants' Motion for Summary Judgment. To the extent that Plaintiff suggests that the factual statements and legal conclusions in Plaintiff's fact-section are undisputed, the motion (Doc. # 57) is granted.

      5. <u>Term</u>: The term of this Agreement shall be from the date hereof through the Grand Opening of the subject venue and continue with management until Universal has permanent management. Notwithstanding the foregoing, Universal may terminate this Agreement by providing Top Notch thirty (30) days written notice.

. . . .

      10. <u>Cancellation</u>: If for any reason Universal decides not to proceed with recommended development plans, Universal agrees to reimburse Top Notch for all expenses incurred in the development of the plans, applications, and other development related experiences.[2]

(*Id*. at ¶¶ 3-5, 10.)

Brew moved to Montgomery sometime after the Agreement was executed in April and began performing contractual duties. On August 30, 2005, Beasley informed Brew via telephone that Beasley was terminating the contract, that Brew must vacate the apartment Beasley was allowing him to use, and that Brew must stop working on the project. (Brew Interrog. # 10.) Brew and Beasley also exchanged several emails that day. In one email, Beasley wrote: "I'm terminating the contract between me and u [sic]." (August 30, 2005 Emails.) Top Notch immediately ceased performance under the contract.

Top Notch now alleges that Defendants terminated the contract in order to avoid paying the ten percent commissions, that Defendants continue to utilize Plaintiff's work product and the relationships established by Plaintiff, and that Defendants have failed to fully pay the salary and expenses owed to Plaintiff. Defendants admit to continuing with plans to open a restaurant but deny using any of Plaintiff's work product or relationships established by Plaintiffs.

---

[2] Plaintiff alleges the parties agreed to an amendment to the contract which would have changed the salary provision so that Defendants would have continued paying Plaintiff $5,000 monthly plus expenses until the restaurant was operational. Defendants have filed a Motion to Strike (Doc. # 33) documents that Plaintiff contends constitute the amendment to the Agreement.

The parties agree that, over the course of the contract, Defendants made four payments of $5,000 to Plaintiff, another payment of $4,500, and that Defendants paid Plaintiff's expenses for May, June, and July. (Brew Interrog. # 25.) The parties also agree that, during the course of the contract, Defendants received a $100,000 loan from Compass Bank for operating expenses and Defendants have not paid a ten percent commission to Plaintiff for that loan. (Compl. ¶¶ 41-43, Brew Interrog. # 11.) Defendants provide the affidavit of Rob Hertenstein, then Vice President and Corporate Banking Manager at Compass Bank, who claims that Compass provided the $100,000 line of credit based on Beasley's signature and not based on any business plan prepared by Brew: "Mr. Beasley's credit was sufficient for the line of credit established by Compass Bank." (Hernstein Aff. ¶¶ 3-5.) Neither Defendants nor Hertenstein deny specifically that Brew had *some* involvement in getting the loan.

Plaintiff alleges that it arranged loans and lines of credit from Citibank, Creative Equipment Leasing, and Brady Distributing Company in the total amount of $2,931,000. As evidence, Plaintiff submits what could be characterized as pre-approval letters, describing financing amounts and conditions defendant Beasley could expect to receive subject to certain conditions, from each of the lenders. All of the letters contain language cautioning that the letters did not represent commitments to lend.

Defendants provide affidavits from two of the lenders who deny ever completing the financing arrangements. Chris Shields, Business Development Manager for Creative Equipment Leasing, confirms "[t]here was no guaranteed loan commitment for this project. The only conversations I had with Mr. Brew involved negotiations and tentative offers." (Shields Aff. ¶ 3.) Shields further states that "CEF never approved any line of credit." (*Id*. at ¶ 4.) Defendants also

4

provide an affidavit from James G. Smily III, Vice President of Brady Distributing Company, who states that Brady "never approved a line of credit in the amount of $600,000." (Smiley Aff. ¶ 4.) Plaintiff provides no further evidence that these loans were completed. Plaintiff has provided no evidence by affidavit or deposition in which Defendants or anyone working with Defendants admit that Defendants are using Plaintiff's work product or that Defendants are using relationships established by Plaintiff.

Plaintiff bases part of its intellectual property claim[3] on its business plan and "100's of additional documents." (Defs.' Br.) It claims Beasley is using the same "designs, the overall program, the furniture and business layouts and the equipment selections." Beasley is allegedly using Plaintiff's "systems, techniques, processes, patterns of practice, drawings, layouts, and other specialized information." (*Id.*) However, Plaintiff has failed to submit any documents which it claims Defendants' have used without its permission or any evidence, affidavit, deposition testimony, or interrogatory, which tend to show that Defendants are using Plaintiff's intellectual property.

Finally, Plaintiff alleges that defendant Beasley told "Sharon Riggenberg, Don Stansell, Sandy Goodwin, Ken Anderson, Wendy and Ron at Compass" that Plaintiff was terminated for cause and that Brew is "a crook." (Pl.'s Resp.) These allegations are supported solely by Plaintiff's hearsay responses to interrogatories.

---

[3] Plaintiff further claims that Defendants are using the Plaintiff's "concept" for the restaurant. Plaintiff describes the concept as "a family restaurant, entertainment center and games facility. During family hours, my facility catered to families and then after family hours, the sports bar was opened for adults." (Doc. # 54.) Defendant does not deny that the concept for his restaurant is based on Brew's restaurant. However, during the pretrial conference held on February 23, 2007, Plaintiff's attorney conceded that there is at least one national restaurant chain, Dave and Buster's, which uses the same concept.

## II. JURISDICTION AND VENUE

Because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, the court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations in support of both.

## III. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## IV. DISCUSSION

### A. *Breach of Contract*

Plaintiff alleges Defendants breached the Agreement by failing to pay salary for August, September, October, and part of November 2005, by failing to pay expenses for August 2005, and by failing to pay commission on loans. Although the parties do not dispute that over $24,500 was paid to Plaintiff, they dispute what this amount represents. Plaintiff claims the payments represent $5,000 a month salary for May, June, July, and August; $4,500 which represents ten percent commission on a $45,000 loan from Citibank; and expenses for May, June, and July. (Defs.' Br.) In his affidavit, Beasley claims that he paid Plaintiff "[p]ursuant to our contract . . . over $25,000 in addition to expenses for April, May, June, July and August, 2005." (*Id.*) Moreover, Defendants' attorney stated at the pretrial conference that Defendants had paid all of the $25,000 owing under the contract. He represented that Defendant Beasley had paid $4,500 as part of the ten percent commission requirement and then, after investigating the Agreement, felt that he did not owe anything pursuant to that part of the Agreement and considered the $4,500 to have applied to the monthly salary provision.

The parties do not dispute the existence of a valid contract, but Plaintiff asserts that the Agreement was amended. The court will address these issues in resolving the Motion for Summary Judgment on the breach of contract claims.

1.  Monthly Salary and Expenses

The parties stipulate that any dispute over monthly salary is governed by the following provision of the Management Agreement: "In consideration for the services enumerated above, Universal shall pay to Top Notch a management fee of $5000.00 per month beginning in May 2005 and each month thereafter until $25,000 is paid . . . ." This provision of the contract is free of ambiguity and neither party has alleged mistake or fraud.

Plaintiff contends that it is entitled to salary through early November and expenses for August and September. To prevail on this claim, Plaintiff must show that a reasonable jury could find that (1) the parties amended the contract such that Defendants were required to pay salary and expenses until the restaurant opened and (2) Defendants did not provide the 30-day written notice of termination required in the contract until early October.

In his brief, Plaintiff claims the parties orally agreed to the amendment (Pl.'s Resp.), but, in his answers to interrogatories, admits that the proposed amendment was never signed by Beasley. Beasley claims he never agreed to the amendment orally or otherwise. Beasley further claims the August 30, 2005, email is sufficient for written termination. Brew contends that he received a written notice of termination on October 8, 2005, via certified mail. (Defs.' Br.)

The court finds that Beasley terminated the contract by email on August 30, 2005. Plaintiff does not dispute that it received an email from Beasley on August 30 which read: "I'm terminating the contract between me and u [sic]." Plaintiff has provided no evidence to suggest the parties

believed email did not constitute written notice. Finally, the parties acted as if the contract was terminated. Brew immediately stopped working on the project and vacated Beasley's apartment. Because the contract requires 30 days written notice, defendant Universal was obligated to pay Plaintiff a salary through September 29, 2006.[4]

Defendants paid salary for the months of May, June, July, and August and expenses for May, June, and July. Plaintiff has presented sufficient evidence to support a jury finding that it is entitled to payment of salary for most of September and payment of expenses for August and September. Those facts are, therefore, in dispute.[5]

2. Ten Percent Commission

Plaintiff also contends that it is entitled to roughly $300,000 under the provision of the contract establishing a ten percent commission on the "final loan." Plaintiff bases this claim on allegations that Plaintiff substantially performed its duties under the contract and that Defendants terminated the contract in bad faith solely to avoid paying the required commissions. A party to a contract may not avoid liability by failing, in bad faith, to cooperate in the other parties' performance. See 17B C.J.S. *Contracts* § 531 ("[p]revention of performance by the promisee has been said to be equivalent to performance by the promisor.") "The party who is prevented by the other party from performing, or whose performance is made impossible by him or her, may treat the

---

[4] Since the original contract required payments through the end of September and Universal's obligation to pay salary and expenses was discharged at the end of September by its termination of the contract, Plaintiff's alleged contract amendment, which would have required Universal to continue paying salary through the opening of the restaurant as long as the contract was *not* otherwise terminated, is irrelevant in determining whether Defendant still owes Plaintiff any monthly salary. Therefore, the court denies Defendants' Motion to Strike the amendment (Doc. # 33) as moot.

[5] Plaintiff's claim for salary will be subject to at least two defenses, that the $4,500 Defendants paid Plaintiff satisfies the salary obligation and that plaintiff had earlier breached his obligation under the contract to act faithfully as defendants' agent. (Doc. # 48.)

contract as broken or breached . . . and may recover whatever damages he or she may have sustained, as if he or she had performed." *Federal Ins. Co. v. I. Kruger, Inc.*, 829 So. 2d 732, 737 (Ala. 2002)(citing 17B C.J.S. *Contracts* § 531); *see also Gulf, Mobile & Ohio R. R. Co. v. Ill. Cent. R. R. Co.*, 128 F. Supp. 311, 324 (N.D. Ala. 1954) ("[O]n principles of simple justice, [a party] cannot be permitted to shield itself from its contractual liability by obstacles of its own creation.")  Thus, Plaintiff has stated a cause of action for breach of contract on the theory that Defendants are, in bad faith, attempting to shield themselves from liability by creating obstacles to Plaintiff's full performance of the contract.

However, in order to survive summary judgment on this cause of action, Plaintiff must offer sufficient evidence by which a reasonable jury could find that Defendants terminated their contract with Plaintiff merely to avoid liability.  As evidence of its performance, Plaintiff submits letters from lenders which state that Defendants have been approved for loans subject to certain conditions. Defendants deny that any lender made "a firm loan commitment" prior to Top Notch's termination and deny that any lender with whom Plaintiff negotiated will be financing Defendants' continuing efforts to open a restaurant.  (Defs.' Br.)   Plaintiff has provided no evidence that suggests Defendants are using Plaintiff's work product or relationships established by Plaintiff.  Rather, Brew states in interrogatory answers that he bases his allegations on information he received from "Ken Anderson, Wendy and Rob from Compass Bank, Steve Wallace, Joe Bohannon, Kyle, Don Stansell, and Sandy Goodwin." (*Id.*)  Without evidence that Defendants have taken out loans to complete this

project or that Defendants have continued to use Plaintiff's work product, no reasonable jury could infer that motive from Defendant's words or conduct.[6]

The only evidence that Defendants have closed on a loan but not paid Plaintiff is a $100,000 loan made by Compass Bank. Defendants acknowledge the existence of such a loan and admit Plaintiff's allegation that the loan, for operating expenses, was taken out in July 2005. The contract language which Plaintiff claims entitles him to a $10,000 fee based on this loan reads: "Upon closing the final loan a total percent of 10% will be split between mortgagee fees and expenses and Top Notch." Plaintiff has argued that the meaning of this sentence was that Plaintiff was entitled to ten percent of all loans taken out by Defendants in pursuit of this project. Defendants deny any liability (Defs.' Answer) but do not address the point head-on. Rather Defendants claim in their summary judgment brief, that as of the submission of that brief, no "final loan" has been closed. (Defs.' Br.) Plaintiff's position is that "the final loan" includes all financing, including loans from banks and lines of credit from suppliers.

"A contractual provision is ambiguous if it is reasonably susceptible of more than one meaning." *FabArc Steel Supply, Inc. v. Composite Constr. Sys., Inc*. 914 So. 2d 344, 357 (Ala. 2005) (citing *Alfa Mut. Ins. Co. v. Nationwide Mut. Ins. Co.*, 684 So. 2d 1295, 1299-1300 (Ala. 1996)). "If the court determines that the terms are ambiguous (susceptible of more than one reasonable meaning), then the court must use established rules of contract construction to resolve the ambiguity." *Id*. (citation omitted). "That parties argue for different constructions of the contract

---

[6] This evidence, if it exists, would not have been beyond the reach of Plaintiff, yet Plaintiff has offered no depositions, interrogatories, or other forms of evidence from anyone other than Plaintiff's president, Brew. Moreover, Plaintiff has largely failed to offer evidence of its substantial performance. When viewed in the light most favorable to Plaintiff, the pre-approval letters from lenders Plaintiff submits do not demonstrate that Plaintiff had performed its duties.

does not itself create ambiguity." *Teitel v. Wal-Mart Stores, Inc.* 287 F. Supp. 2d 1268, 1275 (M.D. Ala. 2003) (citing *Wayne J. Griffin Elec., Inc. v. Dunn Constr. Co.*, 622 So. 2d 314, 317 (Ala. 1993)). "If 'the terms of a contract are ambiguous in any respect, [then] the determination of the true meaning of the contract is a question of fact for the jury.'" *Id.* (quoting *Dill v. Blakeney*, 568 So. 2d 774, 778 (Ala. 1990)). If one must go beyond the four corners of the agreement in construing an ambiguous agreement, the surrounding circumstances, including *the practical construction put on the language of the agreement by the parties* to the agreement, are controlling in resolving the ambiguity. *Voyager Life Ins. Co., v. Whitson*, 703 So. 2d 944, 949 (Ala. 1997) (emphasis added).

In essence, Defendants ask the court to insert the phrase "of the final loan" into the contract so that the critical provision reads: "upon closing the final loan a total percent of 10% *of the final loan* will be split . . . ." Thus, Defendants suggest that the parties believed that there would be one "final loan," that Plaintiff would receive a payment of roughly ten percent of that loan, and that the loan would be a mortgage loan—a loan for the buying of the property and possibly of building the restaurant. Defendants' interpretation seems to comport with the grammatical construction of the sentence because the only loan referred to therein is "the final loan," a phrase suggesting singularity.

Plaintiff's interpretation, however, accords better with reality in the opening of a restaurant. Plaintiff would have the court insert the phrase "of all loans" so that the language reads: "Upon closing the final loan a total percent of 10% *of all loans* will be split between mortgagee fees and expenses and Top Notch." In reality, several loans or lines of credit are often necessary to open a restaurant rather than one final loan. Moreover, Plaintiff claims Defendants paid ten percent to

Plaintiff of a $45,000 loan from Citibank.[7] Viewing the evidence in the light most favorable to Plaintiff, the parties have operated according to Plaintiff's proposed terms. Therefore, the court finds the term "final loan" ambiguous. Plaintiff has met its burden to show a genuine issue of material fact regarding its entitlement to $10,000 as ten percent of the $100,000 Citibank loan based on evidence it may present regarding its performance and the meaning of the term "final loan" under the contract.

### B.    *Quantum Meruit*

"It is the settled law of this State that where one knowingly accepts services rendered by another, and the benefit and result thereof, the law implies a promise on the part of the one accepting with knowledge the services rendered by another to pay the reasonable value of such services rendered." *Hendrix, Mohr & Yardley, Inc. v. City of Daphne*, 359 So. 2d 792, 795 (Ala. 1978). Plaintiff has provided no evidence that Defendants received any benefit from Plaintiff's services apart from Plaintiff's own uncorroborated testimony that Defendants are using Plaintiff's work product. Thus, Plaintiff has not provided evidence sufficient to justify a reasonable jury in finding for it based on a theory of quantum meruit.

### C.    *Trade Secrets*

Plaintiff asks the court to find liability against the defendants for misappropriating its trade secrets in violation of state law. Ala. Code § 8-27-1 *et seq.* (1975). However, Plaintiff has not submitted any "formula, pattern, compilation, computer software, drawing, device, method, technique, or process" for the court to review. The only evidence Plaintiff has provided of any work

---

[7] At the pretrial conference, Defendants denied this payment is a payment owed under the ten percent commission provision of the contract. However, defendants' denial does not overcome the possibility that a reasonable jury could find for the plaintiff on this claim.

product it used and Defendants may continue to use is the concept of the restaurant: an arcade during the day and a bar for adults at night. Plaintiff's counsel conceded during the pretrial conference, however, that this concept is also used by a national restaurant chain and that the concept does not satisfy the basic statutory prescription, that the concept be "not publicly known and . . . not generally known in the trade or business of the person asserting that it is a trade secret." Ala. Code § 8-27-2 (1975).

### D. *Interference with Business Relations*

The tort of interference with business or contractual relations has the following elements: "1) the existence of a contract or business relation; 2) defendant's knowledge of the contract or business relation; 3) intentional interference by the defendant with the contract or business relation; and 4) damage to the plaintiff as a result of the defendant's interference." *Fossett v. Davis*, 531 So. 2d 849, 851 (Ala. 1988). "As a matter of law, a party to a contract cannot tortiously interfere with that contract. In order to interfere with a contract, one must be a 'stranger' to the contract." *Patterson v. Powell, Goldstein, Frazer & Murphy, LLP*, 332 B.R. 450, 453 (N.D. Ala. 2005) (citing *Waddell & Reed, Inc. v. United Investors Life Insurance Co.*, 875 So.2d 1143, 1154 (Ala. 2003)). "Determining whether one is a stranger to a contract turns on many questions - for example, whether one was integral to the relationship, whether he would benefit economically from the terminated contract, and whether an inexplicable interrelationship existed among the parties." *Patterson,* 332 B.R. 450, 453.

The court finds that Beasley is not a stranger to the contract and therefore cannot be sued for interference with it. Thus, Plaintiff's claim for interference with business relations fails.

## V.  CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment (Doc. #47) was DENIED as to Plaintiff's claims for breach of contract in regard to commission for a $100,000 operating loan, expenses for the months of August and September 2005, and salary for the month of September 2005; and was GRANTED in all other respects.

Furthermore, it is ORDERED that:

1. To the extent that Plaintiff suggests that the factual statements and legal conclusions in the fact-section of Plaintiff's Reply to Defendants' Motion for Summary Judgment (Doc. # 54) are undisputed, Defendants' Motion to Strike (Doc. # 57) is GRANTED; and

2. Defendants' Motion to Strike (Doc. # 33) is DENIED as moot.

DONE this 19th day of March, 2007.

                                /s/   W.  Keith Watkins
                                UNITED STATES DISTRICT JUDGE